**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| SMART MOBILE TECHNOLOGIES LLC,<br><br>        Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>        Defendant. | Case No. 6:21-cv-00603-ADA-DTG |
| SMART MOBILE TECHNOLOGIES LLC,<br><br>        Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., and<br>SAMSUNG ELECTRONICS AMERICA,<br>INC.,<br><br>        Defendants. | Case No. 6:21-cv-00701-ADA-DTG |

**PLAINTIFF'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**
**REGARDING THE '501 PATENT FAMILY**

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................... 1

II.   ARGUMENT ................................................................................................................... 1

     A.    "server" (653 (4, 15, 27, 28); 946 (1, 4, 15, 17, 27, 28, 29, 30); 075 (1); 168 (2, 4 19, 20, 28, 29, 34); 501 (1, 13, 16); 936 (1, 9, 11, 19); 937 (1, 13, 16); 739 (1, 13, 16); 863 (1, 4, 5, 6, 11, 14, 19, 24); 119 (20); 083 (6, 8); 943 (6)) ...... 1

     B.    "functional instruction" (501 (1); 936 (1, 13, 20); 937 (1); 739 (1); 119 (20)) ...... 3

     C.    "functional instructions [including instructions] for use in providing a plurality of functions to the [wireless/mobile] device ..." (501 (1); 936 (1); 937 (1); 739 (1); 119 (20)) ................................................................................. 5

     D.    "switching between one or more networks ..." (501 (1); 936 (1); 937 (1); 739 (1); 119 (20)) ............................................................................................... 7

     E.    "the server serves as a primary repository or exchange to deliver various functions to the wireless device" (501 (1); 739 (1)) ................................................ 8

     F.    "the server serves ... to deliver various functions to the wireless device" (501 (1); 739 (1)) / "the server is configured to send to the wireless device a plurality of functions" (936 (1)) / "the server provides a plurality of functions for control of the mobile device" (937 (1)) ........................................... 12

     G.    "dynamic / dynamically" (434 (1); 501 (1, 2); 936 (1); 937 (2); 739 (1, 2); 863 (4); 168 (2, 4)) ................................................................................................. 13

     H.    "wherein the server enables dynamic conversion of the wireless device from a first function to a second function to provide a plurality of functions at the wireless device" (501 (1); 739 (1)) / "wherein the wireless device is dynamically configurable from a first function to a second function to enable a plurality of functions at the wireless device" (936 (1)) / "wherein the server provides a plurality of functions for control of the mobile device and enables conversion of the mobile device from as first function to a second function to provide a plurality of functions at the mobile device" (937 (1)) / "wherein the server enables conversion of the mobile device from a first function to a second function by providing a plurality of functions to the mobile device" (119 (20)) ................................................................................. 16

     I.     "first function" / "second function" / "plurality of functions at (to) the wireless device" (501 (1); 936 (1); 937 (1); 739 (1); 119 (20)) ............................ 18

     J.     "application" (501 (17); 739 (17); 168 (2, 4, 5, 19, 22)) ....................................... 19

     K.    "wherein a private network includes a wireless local area network (WLAN) for use in a home or office" (501 (18); 739 (18)) ................................... 20

     L.    "the prioritization includes data based on GPS or wireless local area network (WLAN)" (937 (18)) ................................................................................ 22

     M.   "A mobile device communication system ..." (119 (20)) ..................................... 23

     N.    "the wireless device transmitter and receiver are independently tunable to one or more frequencies" (168 (2)) ...................................................................... 24

O.    "one or more primary values and subsidiary values" (168 (2, 4)) ...................... 26

P.    "the software is associated with a user and the device stored in a profile" (168 (4)) ................................................................................ 28

Q.    "the remote server stores in memory software for a wireless device" (168 (2)) / "the server is configured to store software for a plurality of wireless devices" (168 (4)) ................................................................ 30

R.    "wherein responsive to a request from the one or more wireless device to a website or URL associated with a website server or a network environment, the one or more wireless device receives an indicator of a software application to be downloaded from the remote server" (168 (19)) ........ 32

S.    "more precise location" (168 (21)) ...................................................... 33

III.    CONCLUSION ............................................................................. 35

## TABLE OF AUTHORITIES

**CASES**

*3M Innovative Props. Co. v. Tredegar Corp.*,
    725 F.3d 1315 (Fed. Cir. 2013) ............................................................................... 17

*Am. Med. Sys., Inc. v. Biolitec, Inc.*,
    618 F.3d 1354 (Fed. Cir. 2010) ............................................................................... 24

*Baldwin Graphics Sys., Inc. v. Siebert, Inc.*,
    512 F.3d 1338 (Fed. Cir. 2008) ................................................................................. 2

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
    289 F.3d 801 (Fed. Cir. 2002) ................................................................................. 24

*Celgene Corp. v. Peter*,
    931 F.3d 1342 (Fed. Cir. 2019) ................................................................................. 2

*Chef America, Inc. v. Lamb-Weston, Inc.*,
    358 F.3d 1371 (Fed. Cir. 2004) ................................................................................. 8

*Clare v. Chrysler Group LLC*,
    819 F.3d 1323 (Fed. Cir. 2016) ............................................................................... 11

*ClearOne, Inc. v. Shure Acquisition Holdings, Inc.*,
    35 F.4th 1345 (Fed. Cir. 2022) ............................................................................... 15

*Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*,
    838 F.3d 1224 (Fed. Cir. 2016) ........................................................................... 4, 21

*Digital Retail Apps, Inc. v. H-E-B, LP*,
    2020 WL 376664 (W.D. Tex. Jan. 23, 2020) ..................................................... 29, 30

*Energizer Holdings v. Int'l Trade Comm'n*,
    435 F.3d 1366 (Fed. Cir. 2006) ...................................................................... 7, 21, 22

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
    349 F.3d 1373 (Fed. Cir. 2003) ............................................................................... 11

*In re Pabst Licensing Digital Camera Patent Litig.*,
    778 F.3d 1255 (Fed. Cir. 2015) ............................................................................... 10

*Intellectual Ventures II LLC v. BITCO Gen'l Ins. Corp.*,
    2016 WL 125594 (E.D. Tex. Jan. 11, 2016) ........................................................... 32

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014) ............................................................................... 35

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) ................................................................................................... 7

*Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*,
    22 F.4th 1369 (Fed. Cir. 2022) .................................................................................. 2

*MCOM IP, LLC v. Woodforest Nat'l Bank & Inetco Sys., Ltd.*,
    2022 WL 1394551 (W.D. Tex. May 3, 2022) ......................................................... 21

*Microprocessor Enhancement Corp. v. Texas Instr. Inc.*,
  520 F.3d 1367 (Fed. Cir. 2008) ........................................................................ 13

*Nautilus Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014) ................................................................................... 4, 21

*Nystrom v. TREX Co.*,
  424 F.3d 1136 (Fed. Cir. 2005) .......................................................................... 5

*Pavo Solutions LLC v. Kingston Tech. Co.*,
  35 F.4th 1367 (Fed. Cir. 2022) ........................................................................... 8

*Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*,
  844 F.3d 1370 (Fed. Cir. 2017) ........................................................................... 4

*Thorner v. Sony Computer Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) .................................................................... 12, 17

*Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*,
  15 F.4th 1136 (Fed. Cir. 2021) ....................................................................... 2, 3

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
  587 F.3d 1339 (Fed. Cir. 2009) ........................................................................... 8

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) .......................................................................... 10

**STATUTES**

35 U.S.C. § 101 ........................................................................................... 11

I.      **INTRODUCTION**

Defendants' brief is essentially an early summary judgment motion. Defendants argue that eleven of nineteen disputed terms are indefinite. Indefiniteness must be proven by clear and convincing evidence. Defendants come nowhere close. As to the remaining eight, Defendants' proposed constructions import limitations from the specification and/or exclude preferred embodiments. Neither is proper. In contrast, Smart Mobile's constructions are faithful to the claim language, are supported by the specification, and are consistent with extrinsic evidence (including Defendants' proffered dictionaries). The Court should adopt Smart Mobile's constructions and reject Defendants' claim construction and indefiniteness arguments.

II.     **ARGUMENT**

A.      **"server" (653 (4, 15, 27, 28); 946 (1, 4, 15, 17, 27, 28, 29, 30); 075 (1); 168 (2, 4 19, 20, 28, 29, 34); 501 (1, 13, 16); 936 (1, 9, 11, 19); 937 (1, 13, 16); 739 (1, 13, 16); 863 (1, 4, 5, 6, 11, 14, 19, 24); 119 (20); 083 (6, 8); 943 (6))**

| Smart Mobile's Construction | Defendants' Construction |
|---|---|
| a computing device or program or collection of computing devices or programs that provides resources, data, services, or programs to other computing devices or programs over a network, or that enables access to a network or network resources | Plain and ordinary meaning |

Defendants "plain and ordinary meaning" construction would provide no guidance to a jury unschooled in computer terminology. Smart Mobile's construction provides that guidance.

Defendants complain that "neither the claims nor the specification refer to a server as a 'program.'" Dkt. 47 at 5.[1] But a patent need not expressly define terms. Absent a definition or clear disavowal of scope, claim terms are given their ordinary meaning to a POSITA at the time of the invention. *E.g.*, *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369,

---

[1] Defendants filed an identical brief and exhibits in each of Case No. 6:21-cv-00603-ADA-DTG and Case No. 6:21-cv-00701-ADA-DTG. Citations herein to Defendants' submissions are to the filings in Case No. 6:21-cv-00603-ADA-DTG.

1378 (Fed. Cir. 2022). The IEEE defines "server" as including "the software component on one device that provides services for use by clients on the same or another device." Ex. 1012 at 1031. "Server" would have been understood to include programs that receive requests from other programs. Ex. 1001 at ¶ 32. The patents include no contrary definition or disavowal.

Defendants argue that "server" should be limited to a single device or program. Dkt. 47 at 5. But the specification discloses "a central server C 214 (one or more)." Ex. 2 at 7:4. So, "a server" can comprise "one or more." The IEEE defines "server" as including a "computer system," Ex. 1012 at 1031, which a POSITA would understand may include a collection of devices or programs working together, Ex. 1001, ¶ 34. Defendants' dictionary similarly indicates that "server" can include multiple devices. *See* Ex. 38 at 640. In view of the specification and ordinary meaning illustrated in technical dictionaries, a POSITA would understand that "server" could mean one or a collection. Ex. 1001, ¶ 34. In addition, "an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *Baldwin Graphics Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008). "The exceptions to this rule are extremely limited: a patentee must evince a clear intent to limit 'a' or 'an' to 'one.'" *Id.* Here, the claims use "a" and "comprising," *e.g.*, Ex. 2 at 9:21-24, so the rule applies. Defendants argue that, "when claiming a 'server,' the claims consistently follow up by reciting functionality that 'the' server ... must be configured to have." Dkt. 47 at 5. But "the subsequent use of definite articles … in a claim to refer back to the same claim term does not change the general plural rule," but rather "simply reinvokes that non-singular meaning." *Celgene Corp. v. Peter*, 931 F.3d 1342, 1350 (Fed. Cir. 2019).[2]

---

[2] Defendants' reliance on *Traxcell Techs., LLC v. Nokia Sols. & Networks Oy* is misplaced. That case involved "computer" and "first computer." 15 F.4th 1136, 1143 (Fed. Cir. 2021). Neither the specification nor any extrinsic evidence supported construing "computer" to include multiple

Finally, Defendants argue that Smart Mobile's "proposal that a server 'provides resources, data, services, or programs to other computing devices or programs over a network' or 'enables access to a network or network resources' fails to place any reasonable limitations on the term." Dkt. 47 at 5-6. But these aspects of Smart Mobile's construction are consistent with the claims and specification. Claim 1 of the '501 patent, for example, recites that "the server serves as a primary repository or exchange to deliver various functions to the wireless device" and "enables dynamic conversion of the wireless device from a first function to a second function to provide a plurality of functions at the wireless device." Ex. 2 at 9:35-39. The specification discloses servers (i) communicating protocols, *id.* at 1:47-52, (ii) delivering content, software, and/or protocols to wireless devices, *id.* at 3:52-54; 5:1-5, and (iii) enabling access to networks and networks resources, *id.* at 6:9-18. And, Defendants' dictionaries support Smart Mobile's construction. *E.g.*, Ex. 35 at 149; Ex. 36 at 255-56; Ex. 37 at 544; Ex. 38 at 640.

## B. "functional instruction" (501 (1); 936 (1, 13, 20); 937 (1); 739 (1); 119 (20))

| Smart Mobile's Construction | Defendants' Construction |
| --- | --- |
| software that, when executed by a processor, provides a function | Indefinite |

The term "functional instruction" appears in independent claims of five patents that use it in the same or substantially the same context: "a memory, wherein a processor is communicatively coupled with the memory, wherein the memory stores **functional instructions** including instructions for use in providing a plurality of functions to the wireless device, at least one of the **functional instructions** provided for switching between one or more networks including at least one public network." Ex. 2 at 9:24-31. Thus, the "functional instructions" are stored in memory and they provide functions to the device. The specification interchangeably

computers. *Id.* During prosecution, the applicant disclaimed multiple computers. *Id.* The Federal Circuit limited "computer" to a single computer. *Id.* at 1144-45. Here, Defendants cite nothing similar in the intrinsic record that would limit "server" to a single device or program.

uses the terms "'functional instruction sets' (FIS) and software (S/W) 218," "FIS and software 218," "functional instruction sets 218," "FIS 218," "FIS 218 (function instruction software)," "functional instruction set 218," "FIS 218 instructions," and "FIS." *See id.* at 3:57-59, 4:13-15, 4:41, 5:3-10, 5:31, 5:42, 5:60-64, 6:9-12, 6:59-61, 7:27-31, 7:50-53, 8:9-12, 8:36-39, 8:43, 8:66. The specification discloses that the functional instructions may be: (i) "stored" on a server or in the mobile device, *id.* at 4:14-15, 7:51-53; (ii) "downloaded" and "uploaded" by the mobile device, *id.* at 4:41, 6:11-12, 8:11, 8:38-39; and (iii) "processe[d] … via the controller and processor electronics" of the mobile device, *id.* at 5:62-63. Software conventionally may be stored, downloaded and uploaded, and processed by a device to provide a function. Ex. 1001, ¶ 39. In the context of the claims and specification, a POSITA would understand "functional instruction" to mean "software that, when executed by a processor, provides a function." Ex. 1001, ¶ 37. The Court should adopt that construction.

Defendants' indefiniteness argument lacks merit. "[T]he dispositive question in an indefiniteness inquiry is whether the 'claims,' not particular claim terms, 'read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.'" *Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1231 (Fed. Cir. 2016) (quoting *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014)). Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application was filed. *Nautilus*, 572 U.S. at 908. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

Here, Defendants complain that "the patents never explain what these 'functional instructions' are." Dkt. 47 at 6. But that is incorrect; as discussed above, the patents disclose

4

"functional instructions" as software. Defendants cite *Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) for the proposition that, "[w]hen different words or phrases are used in separate claims, a difference in meaning is presumed," and Defendants then argue that "the '501, '936, '937, '739, and '119 patents all claim "functional instructions" whereas the '168 patent claims "software." Dkt. 47 at 6. But *Nystrom* involved different claims of the same patent, not different patents. Claims of the '168 patent are not relevant here. And in any event, the Federal Circuit went on to explain that "[d]ifferent terms or phrases in separate claims may be construed to cover the same subject matter where the written description and prosecution history indicate that such a reading of the terms or phrases is proper." *Nystrom*, 424 F.3d at 1143. Here, "functional instructions" and "software" may be construed to cover the same subject matter because the specification equates the two. Defendants have not proven by clear and convincing evidence that the "functional instruction" claims are indefinite.

## C. "functional instructions [including instructions] for use in providing a plurality of functions to the [wireless/mobile] device ..." (501 (1); 936 (1); 937 (1); 739 (1); 119 (20))

| Smart Mobile's Construction | Defendants' Construction |
|---|---|
| software executable by the wireless device that enables a plurality of capabilities | "functional instructions" is indefinite (*see* Section IV.B). The claimed "functions" are types of mobile/wireless devices. (*see* Section IV.H). Otherwise, plain and ordinary meaning. |

Claim 1 of the '501 patent exemplifies the context of this disputed term: "wherein the memory stores **functional instructions including instructions for use in providing a plurality of functions to the wireless device**, at least one of the functional instructions provided for switching between one or more networks including at least one public network." Ex. 2 at 9:27-31. Thus, among the plurality of "functions" that functional instructions provide, when executed by the device, are the capabilities for the device to communicate over multiple networks and to

switch between those networks. Other possible functions are recited in dependent claims, including, for example, controlling various "intelligent appliances." *E.g.*, Ex. 2, claim 5. The specification discloses an embodiment in which the device switches between networks "per specific functional instruction sets 218 and preferences stored … in the CT/MD 202 itself." Ex. 2 at 4:13-15, 7:50-53. The specification also discloses that "detailed FIS 218 may be written for specific wireless intelligent appliances 266 or equipment 238 to control or command all of these using the CT/MD 202." *Id.* at 8:66-9:2. In the context of the claims and specification, a POSITA would understand "functional instructions [including instructions] for use in providing a plurality of functions to the [wireless/mobile] device" to mean "software executable by the wireless device that enables a plurality of capabilities."[3] Ex. 1001, ¶ 41.

Defendants contend simultaneously that this limitation is (i) indefinite, (ii) should be given its plain and ordinary meaning, and (iii) means that the "functional instructions" are "for use in providing a plurality of [types of mobile/wireless devices] to the wireless device." Dkt. 47 at 7. The Court should reject these positions. First, the term "functional instruction" is not indefinite, for the reasons discussed above. Second, if the limitation were indefinite, as Defendants contend, it would have no "plain and ordinary meaning" discernable by a jury. Third, Defendants proffer no evidence for their argument that the "functional instructions" provide "types of mobile/wireless devices" to the wireless device." Nothing in the specification supports such a nonsensical construction. Tellingly, even Defendants' expert does not subscribe to it. Ex. 1. The intrinsic evidence makes clear that the "functions" provided to the wireless device by the "functional instruction" software, when executed on the wireless device, are capabilities.

---

[3] Defendants fault Smart Mobile's construction for replacing "provides" with "enables." Dkt. 47 at 8. "Provide" means "to make something available to." Ex. 1014 at 940. "Enable" means "to provide with the means or opportunity." *Id.* at 380. In this context, they mean the same thing.

**D. "switching between one or more networks ..." (501 (1); 936 (1); 937 (1); 739 (1); 119 (20))**

| Smart Mobile's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning. | Indefinite |

This term appears in five patent claims that use it in the same or substantially the same context: a wireless device stores in memory functional instructions "provided for **switching between one or more networks** including at least one public network." Ex. 2 at 9:27-31. A POSITA would understand that: (1) "switching" conveys a change from one thing to another, (2) "between" sets apart at least two different things, and (3) "networks" is plural and represents the objects of the switch. *See* Ex. 1001, ¶ 48. Additionally, the specification discloses embodiments that switch between multiple networks. *See, e.g.*, Ex. 2 at 3:5-7, 4:11-12, 6:61-65, 7:49-53. Thus, the claim language and specification notify a POSITA with reasonable specificity that the claimed invention involves switching between multiple networks. *See* Ex. 1001, ¶ 48.

Defendants argue that this limitation is indefinite "[b]ecause a POSITA would not be reasonably certain what switching between 'one' network means." Dkt. 47 at 9. "Claim definiteness is analyzed not in a vacuum, but always in light of the teachings of the prior art and of the particular application disclosure as it would be interpreted by one possessing the ordinary level of skill in the pertinent art." *Energizer Holdings v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006) (quotation marks omitted). According to Defendants, the POSITA in this case has a "bachelor's degree in electrical engineering, or equivalent training, and approximately two years' experience working in the field of networking and wireless devices." Dkt. 47 at 3. A POSITA is also presumed to have ordinary creativity and common sense. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). A person having those qualities would not easily be confused by grammatically imperfect claim drafting.

But if the Court were to determine that the plain and ordinary meaning of this term would not be sufficiently clear for a jury, the Court should construe the term as "switching between multiple networks." When construing claim terms the Court "can correct an obvious typographical error" "if the correction is not subject to reasonable debate to one of ordinary skill in the art, namely, through claim language and the specification, and the prosecution history does not suggest a different interpretation." *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1353 (Fed. Cir. 2009) (citation omitted). Here, the claim terms "switching," "between," and "networks" (a plural term) reveal the claim drafter's intent to claim switching between multiple networks. The specification discloses embodiments that switch between multiple networks, *e.g.*, Ex. 2 at 3:5-7, 4:11-12, 6:61-65, 7:49-53, but no embodiments that "switch[] between one .... network[]." Defendants cite nothing in the prosecution history suggesting that the invention is or includes the latter. So, the Court may correct the claim.[4]

### E.  "the server serves as a primary repository or exchange to deliver various functions to the wireless device" (501 (1); 739 (1))

| Smart Mobile's Construction | Defendants' Construction |
|---|---|
| the server stores software that may be transmitted to the | the server stores all functional instruction sets belonging to the wireless device that it uses to respond to mode |

---

[4] Defendants' reliance upon *Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371 (Fed. Cir. 2004), is misplaced. The claim in that case recited "heating ... batter-coated dough to a temperature in the range of about 400 F. to 850 F." *Id.* at 1374. The patentee asked the court to "interpret the claim as if it read 'heating the ... dough at a temperature in the range of,' i.e., to apply the heating requirement to the place where the heating takes place (the oven) rather than the item being heated (the dough)," because otherwise the dough "would be burned to a crisp." *Id.* at 1373-75. The Federal Circuit refused to redraft the claim, noting that "[t]hese are ordinary, simple English words whose meaning is clear and unquestionable." *Id.* at 1373. But as the Federal Circuit explained in *Pavo Solutions LLC v. Kingston Tech. Co.*, 35 F.4th 1367 (Fed. Cir. 2022), *Chef America* does not preclude correction of claim drafting errors. In *Pavo Solutions*, the Federal Circuit affirmed the district court's correction of a claim because (i) the error was evident from the claim language, (ii) "the claim as written facially did not make sense," and (iii) the specification "confirm[ed] the error in the claims by exclusively describing" a device according to the claim as corrected and not as written. *Id.* at 1375. Unlike in *Chef America*, each of those features is found here. *See* Ex. 1001, ¶ 49.

| Smart Mobile's Construction | Defendants' Construction |
|---|---|
| wireless device to enable the device to have various capabilities | reconfiguration requests from the wireless device by downloading and uploading the functional instruction sets and software to and from the wireless device |

The Court should construe this limitation as Smart Mobile proposes. "Deliver ... to" indicates that the server is configured to transmit to the wireless device. The specification describes an embodiment in which the server sends software to, and "for use by," the device that enables the device to have a capability. *See* Ex. 2 at 3:57-59. The specification describes an embodiment comprising a wireless device enabled with various capabilities, including serving as a cordless phone and as a remote controller for intelligent appliances, by "downloading/uploading FIS 218 and/or protocols" from the server. *Id.* at 4:39-49, 5:1-9, 8:36-55. Another device capability, recited in the claims, is the ability to switch between networks. The specification describes how the server enables this capability by transmitting "function instruction software" to the device, which software is stored and processed at the device. *Id.* at 5:1-4, 5:60-6:12. In one embodiment, the server sends the software in response to a request from the device when the device "wishes" to change networks. *Id.* In another embodiment, the device's network switching capability is "per specific functional instruction sets 218 and preferences stored … in the CT/MD 202 itself." *Id.* at 4:13-15. The device "keeps/caches" such software so that the device may "quickly execute tasks and efficiently update changes in models." *Id.* at 6:32-35. Based on the claim language and specification, a POSITA would understand the disputed term as Smart Mobile proposes. *See* Ex. 1001, ¶ 52.

The Court should reject Defendants' proposed construction. First, Defendants' argument that "the server stores *all* functional instruction sets belonging to the wireless device" rests upon an inapposite dictionary. Ex. 1001, ¶ 56. Defendants' expert does not even support it. *See* Ex. 1. Other dictionaries indicate that a "repository" stores some, but not necessarily all, software.

Ex. 40 at 68. This is consistent with the claim language. "Primary" indicates that some software may be stored elsewhere. Ex. 1001, ¶ 55. And, the claims recite that the wireless device's memory "stores functional instructions including instructions for use in providing a plurality of functions to the wireless device." Ex. 2 at 9:27-29; Ex. 5 at 9:32-34. A POSITA would understand that the server cannot store "all" instructions belonging to the wireless device when at least some of those instructions are stored on the device itself. Ex. 1001, ¶ 55.

Second, the claims say nothing about "mode reconfiguration requests" from the device or responses to such requests by the server. Although one disclosed embodiment operates this way, Ex. 2 at 5:1-4, 5:60-6:12, "claims are generally not limited to features found in what the written description presents as mere embodiments," particularly where, as here, "the claim language is plainly broader." *In re Pabst Licensing Digital Camera Patent Litig.*, 778 F.3d 1255, 1265 (Fed. Cir. 2015). In another disclosed embodiment, the device's mode reconfiguration capability is "per specific functional instruction sets 218 and preferences stored … in the CT/MD 202 itself," Ex. 2 at 4:13-15, rather than per functional instructions received from the server responsive to a mode reconfiguration request. An interpretation that excludes a preferred embodiment "is rarely, if ever, correct." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). Defendants' proposed construction excludes the second embodiment and is therefore incorrect.

Third, the claims do not recite "uploading" from the wireless device to the server. Defendants contend that "a POSITA would recognize that 'exchanging' generally requires giving one thing and receiving another." Dkt. 47 at 11. Defendants point to an embodiment involving "uploading" to and "downloading" from a server. *Id.* at 12. But the claims neither contain the verb "exchanging" nor require "uploading" to the server. Moreover, the claim provides that the server serves as a repository "or" an exchange, not a repository "and" an

exchange. A POSITA would understand the claims to be directed to a system comprising a server that stores software that may be transmitted to the wireless device, without a requirement that the wireless device transmit (or "upload") anything to the server. *See* Ex. 1001, ¶ 58.

Fourth, Defendants complain that Smart Mobile's proposed construction for this term in the '501 and '739 patents is the "same" as its proposed construction of terms in the '936 and '937 patents that do not recite a "primary repository or exchange," but the complaint lacks merit. "[T]he doctrine of claim differentiation is not as strong across related patents as it would be if the different claim limitations appeared in the same patent." *Clare v. Chrysler Group LLC*, 819 F.3d 1323, 1330 (Fed. Cir. 2016). The Federal Circuit held in *Clare* that giving the same construction to nonidentical limitations found in two related patents can be appropriate if consistent with the shared specification. *Id.* That is the case here.

Finally, Defendants' reliance upon prosecution amendments is both incomplete and erroneous. It is incomplete because Defendants cite nothing from the '739 patent prosecution that purportedly supports their construction of a term of that patent. It is erroneous because the "double patenting rejections" Defendants highlight were premised upon 35 U.S.C. § 101, which "only prohibits a second patent on subject matter identical to an earlier patent." *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1377 (Fed. Cir. 2003). Here, the applicant overcame the double patenting rejections by simultaneously amending the claims of three different applications. To the claims that issued in the '936 patent, the applicant added "wherein the wireless device is configured for Internet access." Ex. 21 at SM0002033. To the claims that issued in the '937 patent, the applicant added "wherein the memory stores prioritization data related to connecting to a plurality of wireless networks." Ex. 24 at SM0002196. Because neither limitation was included in the claims that issued in the '501 patent, Ex. 23 at SM0001473, the

amendments rendered the claims of the three applications non-identical and thereby overcame the double patenting rejections. The amendments had anything to do with the "server," and so they cannot have been "a clear disavowal of claim scope" as to that limitation. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012).

**F.  "the server serves ... to deliver various functions to the wireless device" (501 (1); 739 (1)) / "the server is configured to send to the wireless device a plurality of functions" (936 (1)) / "the server provides a plurality of functions for control of the mobile device" (937 (1))**

| Smart Mobile's Construction | Defendants' Construction |
|---|---|
| the server is configured to transmit software or application data to the wireless/mobile device that enables a plurality of capabilities | The claimed "functions" are types of mobile/wireless devices. (*see* Section IV.H). Otherwise, plain and ordinary meaning. |

The Court should construe these terms as Smart Mobile proposes. "[D]eliver," "send," and "provide" indicate that the server transmits to the device. The specification distinguishes between scenarios in which the server "performs functions" for the device and scenarios in which the server sends software to, and "for use by," the device that enables the device to have a capability. *Compare* Ex. 2 at 3:53-54 *with id.* at 3:57-59. The specification describes how the mobile device can have various capabilities, including serving as a cordless phone and serving as a remote controller for intelligent appliances, by "downloading/uploading FIS 218 and/or protocols" from the server. Ex. 2 at 4:39-49, 5:1-9, 8:36-55. Another capability, recited in the claims, is the ability to switch between networks. The specification describes how the server enables this by transmitting "function instruction software" to the wireless device, which software is stored and processed at the device. Ex. 2 at 5:1-4, 5:60-6:12. In one embodiment, the server sends the software in response to a request from the device when the device "wishes" to change networks. *Id.* In another embodiment, the network switching capability is "per specific functional instruction sets 218 and preferences stored … in the CT/MD 202 itself." Ex. 2 at 4:13-

15. The device "keeps/caches" such software so that the device may "quickly execute tasks and efficiently update changes in models." *Id.* at 6:32-35. A POSITA would understand the disputed terms to mean that "the server is configured to transmit software or application data to the wireless/mobile device that enables a plurality of capabilities." Ex. 1001, ¶ 60.

The Court should reject Defendants' construction. First. as discussed in Section C, the argument that "the claimed 'functions' are types of mobile/wireless devices"—such that the server "delivers," "sends," and "provides" physical objects to the wireless device—is nonsensical and unsupported. Second, Defendants fault Smart Mobile for construing "function" to mean software that enables a capability, while construing "function" as used elsewhere in the claims (or other claims) to mean capability. Dkt. 47 at 14-15. But a claim term that appears more than once need not necessarily be construed the same way. *E.g.*, *Microprocessor Enhancement Corp. v. Texas Instr. Inc.*, 520 F.3d 1367, 1376 (Fed. Cir. 2008). The appropriate meaning of each use should be determined "from each occurrence in context," particularly when a "uniform construction" would result in a "nonsensical reading." *Id.* Here, the context reveals that "functions" "deliver[ed]," "sen[t]," or "provide[d]" by the server to the device are software.

G. **"dynamic / dynamically" (434 (1); 501 (1, 2); 936 (1); 937 (2); 739 (1, 2); 863 (4); 168 (2, 4))**

| Smart Mobile's Construction | Defendants' Construction |
|---|---|
| when and as needed, responsive to variable conditions and without the need for user intervention | Indefinite |

The claims use "dynamic" and "dynamically" to describe capabilities of a wireless device. For example, claim 1 of the '501 recites that a server "enables dynamic conversion of the wireless device from a first function to a second function." Ex. 2 at 9:37-38. Claim 2 recites that the wireless device is "adapted to switch dynamically between local networks and public carrier networks." *Id.* at 9:41-42. The '936, '937, and '739 patent claims have similar limitations. *See*

Ex. 3; Ex. 4; Ex. 5. Claim 2 of the '168 patent recites that the wireless device "dynamically changes its frequency for communication" and that "both power output and channel bandwidth as are dynamically changed in real time." Ex. 15 at 10:20-25. Claim 4 adds that the wireless device is "dynamically software reconfigurable for the various environments." *Id.* at 10:54-55.

"Dynamic" "describes some action or event that occurs when and as needed." Ex. 1005 at 165; *see also id.* ("dynamic allocation": "allocation … according to current needs"); Ex. 27 at 207 ("dynamic bandwidth allocation": the capability to provide multiple applications "only that share of the bandwidth that the application needs at the moment"); *id.* at 208 ("dynamic resource allocation": the assignment of network capacity to users and services "as required on a moment-to-moment basis"). Ex. 38 at 248 ("dynamic capacity allocation": "[t]he process of determining and changing the amount of shared communications capacity assigned to nodes in the network based on current need"); Ex. 40 at 29 ("dynamic buffering": "[a] buffering technique in which the buffer allocated to a computer program varies during program execution, based on current need"). Consistently with this, the specification associates the terms "dynamic" and "dynamically" with things that occur "in real time." *See* Ex. 2 at 8:59-63, 9:2-5.

The specification discloses that change is "dynamic" when it occurs responsive to variable environmental or other conditions, such as changes in the signal to noise ratio or bit error rate. *E.g.*, Ex. 2 at 2:40-46. The specification explains that "input and output channels 504 are each dynamically tunable … for maintaining reliability and integrity and to receive/transmit wireless communications from/to one or more services." *Id.* at 6:47-51. A POSITA would understand "maintaining reliability and integrity" to mean that changes are made responsive to varied conditions that would otherwise degrade communication reliability and integrity. Ex. 1001, ¶ 65. The specification uses the term "dynamic" consistently with that found in

technical dictionaries, including Defendants'. *See* Ex. 38 at 248 ("dynamic means that …
hardware and/or software … respond instantly to changes as they occur").

In addition, the specification teaches that user intervention is neither required nor
involved for the wireless device to "dynamically" do something:

> "The mobile device is dynamically software reconfigurable for the various
> environments. … For example, current wireless conditions may be
> determined by sensing the signal to noise ratio and the bit error rate."
> Ex. 2 at 2:35-44.

> "The MD is able to sense which environment it is primarily operating in at
> a given moment while maintaining the ability to switch instantaneously to
> a different environment." *Id.* at 3:5-7.

> "The CT/MD 202 … can decide the preferred mode to be in. There may
> be a primary mode and several secondary modes or a hierarchy of modes.
> The primary mode may switch from local office FIG. 2B to a public
> carrier loop 208, followed by a home loop FIG. 2C. This switching may be
> automatic or per specific functional instruction sets 218 and preferences
> stored … in the CT/MD 202 itself." *Id.* at 4:8-15.

> "The secondary or subsidiary modes are active to instantly spring into
> action/service as needed without losing the full feature functionality. Thus
> the device 202 instantly becomes a cell phone in the public earner network
> 210 upon receiving a signal even when it is operating in the local wireless
> network 208 loop." *Id.* at 6:13-18.

Thus, the "dynamic" switching, conversion, and reconfiguration occur instantaneously and
automatically according to instructions stored in the device, without a need for user intervention.

"Dynamic" and "dynamically" are not indefinite. Defendants complain of "ambiguity in
claim scope," Dkt. 47 at 16, but susceptibility to more than one meaning does not render a term
indefinite. *See ClearOne, Inc. v. Shure Acquisition Holdings, Inc.*, 35 F.4th 1345, 1351 (Fed. Cir.
2022). Defendants say the specification "provide[s] no guidance" for what "dynamic" means, but
they ignore the disclosures discussed above. Defendants also largely ignore the cited technical
dictionaries in favor of inapposite general purpose dictionaries. Defendants' lawyer argument
and conclusory expert testimony is not clear and convincing evidence of indefiniteness.

**H.** **"wherein the server enables dynamic conversion of the wireless device from a first function to a second function to provide a plurality of functions at the wireless device" (501 (1); 739 (1)) / "wherein the wireless device is dynamically configurable from a first function to a second function to enable a plurality of functions at the wireless device" (936 (1)) / "wherein the server provides a plurality of functions for control of the mobile device and enables conversion of the mobile device from as first function to a second function to provide a plurality of functions at the mobile device" (937 (1)) / "wherein the server enables conversion of the mobile device from a first function to a second function by providing a plurality of functions to the mobile device" (119 (20))**

| Smart Mobile's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning, subject to "server," "dynamic / dynamically," and "first function" / "second function" / "plurality of functions at (to) the wireless device," which should be construed as proposed by Smart Mobile | "conversion of the mobile/wireless device from a/as first function to a second function to/by provide/providing a plurality of functions at/to the mobile/wireless device": transformation from a first type of mobile/wireless device with a first set of capabilities to a second type of mobile/wireless device with a different, second set of capabilities to/by provide/providing a plurality of types of mobile/wireless devices at/to the mobile/wireless device "configurable from a first function to a second function to enable a plurality of functions at the wireless device": transformable from a first type of wireless device with a first set of capabilities to a second type of wireless device with a different, second set of capabilities to enable a plurality of types of wireless devices at the wireless device |

The Court should give these similarly phrased limitations their plain and ordinary meanings. Defendants say the parties' dispute "centers on what it means to 'convert' or 'configure' from a first 'function' to a second 'function.'"[5] Dkt. 47 at 17. The specification discloses that the wireless device of the invention "is dynamically software reconfigurable for … various environments." Ex. 2 at 2:35-36. "Configuration" refers to the current "operating state" of the device. *Id.* at 8:56-65. For example, a device may be configured to operate on a public

---

[5] Defendants do not propose a construction for "the server enables" or "the server provides." The specification discloses that the server "enables" conversion and "provides" functions by transmitting software to the wireless device. *E.g.*, Ex. 2 at 4:13-15, 5:56-5:57, 7:50-53. And, although Defendants state that, "in this context, 'function' refers to a 'type' of wireless/mobile device," Dkt. 47 at 17, that construction would mean that the server of the '937 patent "provides a plurality of [types of wireless/mobile devices]" to or for control of the mobile device. Defendants cite nothing in the patent that supports such a nonsensical construction. Their constructions reveal that Defendants actually agree that "functions" means "capabilities."

cellular network or on a local network. *Id.* at 2:36-40, 3:62-67, 5:53-59. As another example, a device may be configured to control "wireless intelligent appliances." *Id.* at 8:66-9:5; *see also id.* at 1:52-55, 6:1-4. The specification discloses that a wireless device can have a plurality of configurations and that it can "convert" or "switch" its configuration per functional instructions and preferences stored in the wireless device itself. *Id.* at 4:1-15, 5:66-67, 7:50-53. For example, a wireless device "instantly becomes a cell phone in the public carrier network 210 upon receiving a signal even when it is operating in the local wireless network 208." *Id.* at 6:15-18. In the parlance of the patent, "[t]he secondary or subsidiary modes are active to instantly spring into action/service as needed without losing the full feature functionality." *Id.* at 6:13-15. Consistently with this, the device as claimed has not only one but a "plurality of functions."

The Court should reject Defendants' proposed constructions. Largely side-stepping the specification, Defendants rely principally on the prosecution history of a related patent.[6] For a patentee's prosecution statements to be narrowing, they must amount to "a clear disavowal of claim scope." *Thorner*, 669 F.3d at 1366. If they are "amenable to multiple reasonable interpretations, they cannot be deemed [a] clear and unmistakable" disavowal. *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013). Defendants first highlight applicant's statement that its solution entails "a single CT/MD that can transform or morph by software means from one type of communication device to another." Dkt. 47 at 18. But no POSITA would understand the applicant to be contending that its device physically "transforms" or "morphs" into a different device. Ex. 1001, ¶ 72. This is particularly so in view of the rest of the quoted sentence (which Defendants omit), by which the applicant explained what this

---

[6] Defendants' Exhibit 20 is an excerpt from the prosecution history of application No. 09/591,381, which issued as U.S. Patent No. 7,929,950 and to which the '501, '936, '937, '739, and '119 patents relate through a series of continuations.

assertion meant: software allowed the device to "communicate in a multiplicity of communication protocols for different types of communication needs." Ex. 20 at SM0001169. Viewed in context, this and other statements by the applicant quoted at page 18 of the Defendants' brief do not amount to any "clear and unmistakable" disavowal of claim scope. Rather, they are consistent with the plain and ordinary meaning of the claim language: that the server enables the wireless device to have multiple functions and to convert between them.

Defendants next argue that the applicant "distinguished a prior art device by arguing that the prior art 'device remains the same with the same original capabilities for communication,' both before and after the alleged conversion." Dkt. 47 at 19. According to Defendants, "the patentee itself argued that 'conversion' is a transformation that results in different capabilities." *Id.* But this mischaracterizes the prosecution history. The Examiner issued a rejection based on U.S. 5,872,926 ("Levac"), which is directed to a "system and method for transmitting a message generated by a message source to diverse communication devices. … The message is converted to a format appropriate for communicating with selected communication devices …." Ex. 1013 at Abstract. The applicant responded that the recipient devices of Levac did not convert or switch between functions or "capabilities." Ex. 20 at SM0001145. A POSITA would not perceive this to be a clear statement by the applicant that "conversion" or "configuration" require physical "transformation [of the device] that results in different capabilities" as Defendants contend. *See* Ex. 1001, ¶ 73.

## I. "first function" / "second function" / "plurality of functions at (to) the wireless device" (501 (1); 936 (1); 937 (1); 739 (1); 119 (20))

| Smart Mobile's Construction | Defendants' Construction |
|---|---|
| first capability / second capability / plurality of wireless device capabilities | This term should be construed, if at all, in the context of the larger phrase identified above in Section IV.H to the extent the terms overlap. To the extent the terms do not overlap, the nonoverlapping portions do not require construction (i.e., |

| Smart Mobile's Construction | Defendants' Construction |
|---|---|
|  | plain and ordinary meaning). |

Defendants say "these terms are entirely encompassed in the broader claim language" addressed Section IV.H of their brief. Dkt. 47 at 20. Those arguments are addressed above in Section H. Smart Mobile also refers the Court to Section F, which further addresses "function."

### J. "application" (501 (17); 739 (17); 168 (2, 4, 5, 19, 22))

| Smart Mobile's Construction | Defendants' Construction |
|---|---|
| a software program that enables a device to perform one or more tasks | '168 (2, 4), '501 (17), '739 (17) Plain and ordinary meaning, which is use, role or task<br><br>'168 (5, 19, 22) Plain and ordinary meaning, which is a software program designed to assist in the performance of a specific task |

This Court should construe "application" as Smart Mobile proposes.[7] Claims 2 and 4 of the '168 patent recite a server that is "configured to store … software for a plurality of … applications" for wireless devices. Ex. 15 at 9:61-63, 10:43-45. Claim 5 recites that the device "downloads an application to function as a remote control." *Id.* at 10:66-67. Claim 19 recites that the wireless device "receives an indicator of a software application to be downloaded from the remote server." *Id.* at 12:14-16. Claim 22 recites that the "device is configured to download an application" from the server. Ex. 15 at 12:22-24. "Storing" and "downloading" would indicate to a POSITA that an "application" is a software program. Ex. 1001, ¶ 77. Dependent claims 17 of the '501 and '739 patents recite "wherein the first and second function includes one or more of intelligent device control applications, IP telephony functions, video applications, television functions, audio applications, and electronic mail transmit and receive functions." Ex. 2 at 10:36-40. A POSITA would understand that it is software that enables a wireless device to have such

---

[7] Smart Mobile has simplified its proposed construction in a manner that moots various of Defendants' criticisms discussed at pages 22-23 of their brief.

capabilities, and that "application" is used in these claims with its ordinary meaning: a program that enables a device to perform one or more tasks. Ex. 1001, ¶ 77; *see also* Ex. 1012 at 46; Ex. 27 at 44; Ex. 46 at 32.

Defendants agree that "application" means a "software program" in certain claims, but they argue that the term means "use, role, or task" in other claims. Dkt. 47 at 21. For the latter, Defendants principally cite uses of the word "application" in the specification. *Id.* (citing Ex. 15 at 1:18-21, 9:21-23). Defendants admit that the word's meaning can vary depending upon context. The specification in the cited instances is using "application" with its non-technical meaning: "the use to which something can or should be put." Ex. 28 at 60. A POSITA would understand that the term has a different meaning as used in the claims. Ex. 1001, ¶ 79.

If the Court were to accept Defendants' bifurcated approach, the Court should reject Defendants' second proposed construction because it is unhelpfully vague. A jury will be left to guess what it means for a software program to "assist" in the performance of a task, including whether the "assisted" entity is the device, the user (a person), another program, or something else. *See* Ex. 1001, ¶ 80. Moreover, Defendants' proposal would provide the jury with no guidance as to which tasks are "specific" and which are not. *See id.* Smart Mobile's proposed construction avoids these problems.

**K. "wherein a private network includes a wireless local area network (WLAN) for use in a home or office" (501 (18); 739 (18))**

| Smart Mobile's Construction | Defendants' Construction |
|---|---|
| Plain meaning. | Indefinite |

Defendants argue that this limitation is indefinite because "the dependent claims recite a new limitation for what some unknown 'private network' includes, even though the claims never recite a 'private network' in the first place." Dkt. 47 at 23. "[T]he dispositive question in an

indefiniteness inquiry is whether the 'claims,' not particular claim terms, 'read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.'" *Cox Commc'ns*, 838 F.3d at 1231 (quoting *Nautilus*, 572 U.S. at 901). "When the meaning of the claim would reasonably be understood by persons of ordinary skill when read in light of the specification, the claim is not subject to invalidity upon departure from the protocol of 'antecedent basis.'" *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006). "Whether [a] claim, despite a lack of explicit antecedent basis [for a term], nonetheless has a reasonably ascertainable meaning must be decided in context." *Id.* "[A]n antecedent basis can be present by implication." *Id.*[8]

Here, as discussed in Section D above, claim 1 of these patents recites switching between multiple "networks." One of them is claimed to be a public network. *See* Ex. 2 at 9:30-31; Ex. 5 at 9:35-36. A POSITA would understand that one or more networks additional to the public network is contemplated but not specified by claim 1. Ex. 1001, ¶ 82. The specification discloses embodiments that switch between multiple networks, one of which is a public carrier network and another of which is a private home or office network. *See, e.g.*, Ex. 2 at 2:35-42, 4:11-12, 5:53-6:5, 7:49-53. In view of the claim language and specification, a POSITA would reasonably ascertain that the "private network" recited in claim 18 is one of the "networks" that the device capable of "switching between" as recited in claim 1. Ex. 1001, ¶ 82.

---

[8] *See also MCOM IP, LLC v. Woodforest Nat'l Bank & Inetco Sys., Ltd.*, 6-21-CV-989-ADA, 2022 WL 1394551, at *8 (W.D. Tex. May 3, 2022) (finding that lack of antecedent basis for a term did not render a claim indefinite because "a POSITA could reasonably ascertain the meaning of the term based on its contextual use in the claims, the specific examples provided by the [patent], and the related disclosure provided in the specification").

**L. "the prioritization includes data based on GPS or wireless local area network (WLAN)" (937 (18))**

| Smart Mobile's Construction | Defendants' Construction |
|---|---|
| Plain meaning. | Indefinite |

Defendants contend that "'the prioritization' in claim 18 has no antecedent basis." Dkt. 47 at 24 n.13. As discussed in Section K above, antecedent basis may be "present by implication," and in any event a claim is not invalid as indefinite due to lack of antecedent basis when the meaning of the claim would reasonably be understood by persons of ordinary skill when read in light of the specification. *E.g.*, *Energizer Holdings*, 435 F.3d at 1370. (Fed. Cir. 2006). Here, claim 18 depends from claim 1, which recites that "the memory [of the mobile device] stores prioritization data related to connecting to a plurality of wireless networks." Ex. 4 at 9:31-32. A POSITA would understand that "the prioritization" in claim 18 refers to the "prioritization data" recited in claim 1. Ex. 1001, ¶ 85. Claim 18 does not lack antecedent basis.

Defendants next contend that "[n]either the claim nor specification provide any context for what it means for prioritization data to be 'based on' GPS or a WLAN." Dkt. 47 at 24. Incorrect. Figure 4 and associated text describe how a device prioritizes wireless networks (which the patent calls "loops") in which the wireless device will operate. Figure 4 depicts the device first prioritizing the public carrier network ("primary") over home ("secondary") and local office ("tertiary") networks. The specification explains that, when the wireless device is operating in a primary network, "[t]he secondary or subsidiary modes are active to instantly spring into action/service as needed without losing the full feature functionality." Ex. 4 at 6:13-15. Thus, the device can "instantly" switch to a second network "upon receiving a signal," even when it is operating in a first network. *Id.* at 6:15-18. A POSITA would understand that a "signal" must be sufficiently strong to be "received," and the strength of a signal (as measured,

for example, by the signal to noise ratio and the bit error rate) will vary according to the location of the wireless device relative to, for example, a cellular base station or a local wireless network access point. Ex. 1001, ¶ 85. The specification discloses that "[t]he ability to sense and switch from one mode to the other may including linking 222 to a Global Positioning System (GPS) 220 that determines the exact location of the CT/MD 202." Ex. 4 at 4:1-4. And, "the CT/MD 202 may sense … the location of the network box or the net to bring the CT/MD 202 into any local or carrier loop 208." *Id.* at 4:4-7. Based upon the claim language in view of these disclosures, a POSITA would understand claim 18 to mean that the wireless device's "prioritization" of connecting to one network over another will be based upon GPS location information or information regarding proximity of a wireless local area network relative to the device. Ex. 1001, ¶ 85. Claim 18 is not indefinite.

## M. "A mobile device communication system ..." (119 (20))

| Smart Mobile's Construction | Defendants' Construction |
|---|---|
| Preamble is not limiting. The server is not part of the claimed mobile device communication system. | The preamble is limiting. The server is part of the claimed mobile device communication system. |

This is the preamble to claim 20 of the '119 patent. Defendants contend that "[t]he preamble is limiting," which would mean, according them, that "[t]he server is part of the claimed mobile device communication system." Dkt. 47 at 24. Defendants evidently agree that if the preamble is not limiting then the server is not part of the claimed system. Courts presume that the preamble does not limit a claim. *E.g., Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010). And, "a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (citation omitted). Here, claim 20 defines a structurally complete invention in

the claim body, without a "server" being part of the claimed "system." Ex. 1001, ¶ 90. In particular, it recites a memory, processor, functional instructions, and communication protocols, and it implies structure (e.g., transmitters and receivers) for wireless communication. A POSITA would understand that, together, such structure constitutes the claimed "a mobile device communication system," and that a server is not required for the "system" to be complete. *Id.*

### N. "the wireless device transmitter and receiver are independently tunable to one or more frequencies" (168 (2))

| Smart Mobile's Construction | Defendants' Construction |
|---|---|
| the transmitter and receiver of the wireless device each may be tuned to one or more frequencies | Indefinite |

This limitation appears in claim 2 in the context of several limitations directed to transmitting and receiving. *See* Ex. 15 at 10:10-21. Although the surrounding limitations claim that the wireless device can "transmit and receive at a plurality of frequencies" and is "enabled to be tuned to transmit and/or receive frequencies including one or more primary values and subsidiary values" the limitation at issue adds that the transmit and receive frequencies need not be the same.

Smart Mobile's proposed construction is consistent with the specification, which provides that the wireless device "can function in the local office loop 230" which, in turn, "can operate at the same or a different frequency for T/R." Ex. 15 at 4:25-29. Thus, the wireless device can transmit on frequencies that may be the same as, or may be different than, the frequencies on which it receives. In describing a wireless device's change from one primary mode (*e.g.*, public carrier) to a different primary mode (*e.g.*, local wireless), the specification discloses that the device "tunes/sets the frequencies within the T/R blocks" such that the device is "converted" to the new mode. Ex. 15 at 6:1-5. Use of the plural term, "frequencies," indicates that there may be different transmit and receive frequencies. Shortly after these disclosures, the

patent states that "[t]he Transmitter and Receiver are independently tunable to one or more frequencies for operation in different environments." Ex. 15 at 6:42-44. In view of the specification, a POSITA would understand the disputed term to means that the transmitter and receiver of the wireless device each may be tuned to one or more frequencies, which frequencies need not be the same. Ex. 1001, ¶ 93.

Defendants argue indefiniteness, primarily based upon their assertion that the patent fails to disclose "a scenario in which the transmitter and the receiver are … tuned to different frequencies." Dkt. 47 at 26-27. Defendants are mistaken. As discussed above, the patent discloses that the wireless device can operate at the same or different frequencies for transmit and receive. Defendants also premise their argument on an incorrect interpretation of the claim terms "transmitter" and "receiver." The patent uses these terms to collectively reference the structure of the wireless device that enables, respectively, transmission and reception of wireless communication. This is depicted, for example, in Figure 3, which illustrates the "internal structure 304 of CT/MD 302." Ex. 15 at 5:42-43. The figure does not depict transmitters and receivers for cellular communication separately from transmitters and receivers for local wireless communication, yet the patent describes the wireless device as being capable of both. A POSITA would understand that different transmitters and receivers are conventionally used for these types of communication. Ex. 1001, ¶ 95. In view of the specification, a POSITA would understand that both Figure 3 and the patent claims use the term "transmitter" to collectively include one or more transmitting components and use the term "receiver" to collectively include one or more receiving components. *Id.*

O.  "one or more primary values and subsidiary values" (168 (2, 4))

| Smart Mobile's Construction | Defendants' Construction |
|---|---|
| "primary values:" a set of frequencies associated with a preferred wireless network that is either a public carrier network or a local area network<br><br>"subsidiary values:" a set of frequencies associated with a non-preferred wireless network that is a local area network if the preferred wireless network is a public carrier network or is a public carrier network if the preferred wireless network is a local area network | Indefinite |

Claims 2 and 4 of the '168 patent recite that the "the wireless device is enabled to be tuned to transmit and/or receive frequencies including one or more primary values and subsidiary values." Ex. 15 at 10:11-14, 10:56-58. Smart Mobile's proposed construction is supported by Figure 4 and associated text in the specification. *Id.* at 5:51-6:45; Fig. 4. The specification describes embodiments that have various potential "modes" for the wireless device. Figure 4 depicts two such modes. Each mode entails a different prioritization or preference of wireless networks ("loops") in which the wireless device will operate. In "current mode" 402, the device prioritizes the public carrier network as "primary," the home network as "secondary," and the local office network as "tertiary." As Figure 4 depicts, each network is associated with its own set of frequencies, denoted as $F_P$, $F_H$, and $F_L$. The specification explains that it is preferable for local wireless networks to operate using different frequencies than the public carrier network. *Id.* at 4:29-33, 4:66-67, 8:5-9. The set of frequencies associated with the primary network is the "primary frequency" and the set of frequencies associated with the secondary network is the "secondary frequency." *Id.* at 6:2-3. It is in this context that the specification explains that "Transmit and Receive frequencies may be tuned to one or more primary values and one or more subsidiary values." *Id.* at 6:12-14. In view of the specification, a POSITA would understand that the terms "primary values" and "subsidiary values" each means "a set of frequencies associated with a wireless network," with each network using a different set of frequencies. *See* Ex. 1001,

26

¶ 99. A POSITA would further understand that the "primary" value frequencies are those used by the network that the wireless device prioritizes or prefers over the network associated with the "subsidiary" or secondary value frequencies. *Id.* If the device prioritizes connecting to a public carrier network, then the "primary" frequencies are those of the public carrier network and the "subsidiary" frequencies are those of the wireless local area network. *Id.* If the device prioritizes connecting to a wireless local area network, then the "primary" frequencies are those of the wireless local area network and the "subsidiary" frequencies are those of the public carrier network. *Id.*

Defendants present various arguments for why this claim term limitation is indefinite, but the Court should reject all of them. Defendants first complain that "[n]either the claims nor specification provide any guidance … for assessing whether a value is 'primary' or 'subsidiary.'" Dkt. 47 at 28. Incorrect: as discussed above, Figure 4 and associated text teach that "primary" refers to frequencies used by a network that is prioritized or preferred over another network that uses "secondary" or subsidiary frequencies that are different from the "primary" frequencies.

Defendants next complain that "the specification uses 'primary' and either 'subsidiary' or 'secondary' to describe *modes*—not values or frequencies." Also incorrect: the specification refers to the set of frequencies associated with the "primary" network as the "primary frequency" and the set of frequencies associated with the "secondary" network as the "secondary frequency." Ex. 15 at 6:2-3. And, Figure 4 depicts how each of the "primary" and "secondary" networks is associated with its own set of frequencies (e.g., $F_P$, $F_H$, etc.).

Defendants then quibble with the word "preferred" in Smart Mobile's proposed construction, but the Court should not be swayed. The specification discloses that the wireless device "can decide the preferred mode to be in." Ex. 15 at 4:10-11, 7:54-55. The specification

describes and depicts a scenario in which the wireless device "wishes" to change its "current mode," in which the public carrier network is "priorit[ized]" as "primary" over other networks, to a different mode in which the public carrier network is "priorit[ized]" as "secondary." Ex. 15 at 5:57-59; Fig. 4. "Preferred" is consistent in wording and concept with the specification.

Finally, Defendants dispute "set of frequencies" because, according to them, "[t]he specification consistently describes each device mode as having a single frequency." Dkt. 47 at 29. Defendants ignore that the claim recites "one or more" and "values," terms that encompass more than one frequency. In addition, the specification uses "frequency" to refer to one or more frequencies. For example, the patent states that "[w]ireless devices are made to operate at a single set frequency to transmit and receive on a narrow frequency band" and that the wireless device of the invention can "function in the local home loop 260 … able to T/R in a specific home frequency band." Ex. 15 at 1:13-14, 4:61-63. The specification also states that it is preferable for "local" wireless networks, such as a "local office loop," "to be at different frequencies that are geared toward a smaller area of influence" so that the local wireless network "do[es] not interfere with, for example, a public carrier frequency domain." Ex. 15 at 4:29-33, 8:5-9. A POSITA would understand that the terms "frequency band" and "frequency domain" each, by definition, encompasses more than a single frequency. *See* Ex. 1001, ¶ 103.

**P.    "the software is associated with a user and the device stored in a profile" (168 (4))**

| Smart Mobile's Construction | Defendants' Construction |
|---|---|
| the software stored on the server is for a plurality of wireless devices and for a plurality of applications for the plurality of wireless devices, and is associated with information, about a user and the device, that is stored in a profile | Indefinite |

Defendants argue that "the software" lacks antecedent basis. Dkt. 47 at 29-30. As discussed in Section K above, antecedent basis may be present by implication, and a claim is not

invalid as indefinite due to lack of antecedent basis when the meaning of the claim would reasonably be understood by persons of ordinary skill when read in light of the specification. Here, the only recitation of software (as a noun) in claim 4 is in the immediately following limitation, which provides: "wherein the server is configured to store software for a plurality of wireless devices and for a plurality of applications for the plurality of wireless devices." Ex. 15 at 10:43-44. A POSITA would understand that the "software … associated with a user and a device stored in a profile" is the "software," stored on the server, "for a plurality of wireless devices and for a plurality of applications for the plurality of wireless devices." Ex. 1001, ¶ 106.

Defendants next argue that "a POSITA would not be reasonably certain about what must be 'stored in a profile,'" because "[p]lainly, a user and a device (physical objects) cannot be stored in a profile." Dkt. 47 at 30. The Court recently considered and rejected a similarly facile argument in *Digital Retail Apps, Inc. v. H-E-B, LP*, No. 6-19-cv-00167-ADA, 2020 WL 376664 (W.D. Tex. Jan. 23, 2020). There, the parties disputed the meaning of claim terms including "transmitting to the electronic device the goods or services purchased by the consumer." *Id.* at *3. The Court explained that "a person ordinarily skilled in the art would understand the term[] [is] not referring to matter-energy transport (i.e., transporting the literal 'goods and services'). Rather a person ordinarily skilled in the art, let alone a lay person, would understand the patent is describing transmitting information (i.e., a list of the goods purchased) to the electronic device." *Id.* at *3 n.1. Similarly here, a POSITA would understand that "user and the device stored in a profile" refers to *information* about a user and device, not physical objects, stored in a profile.

Finally, Defendants contend that "the specification says nothing about a profile storing 'information about' a device." Dkt. 47 at 31. Incorrect: the specification discloses that wireless devices "can store profiles and other user specific information" on a server, Ex. 15 at 3:57-58,

and wireless devices "utilize[] the profiles and other user specific information 218 stored" on the server, *id.* at 7:33-34. The specification also discloses that information about a device that could be stored by a server includes, for example, "preferences" regarding the device's "preferred mode." Ex. 15 at 4:10-17, 7:54-61. A POSITA would understand that in client-server systems it is not uncommon for the server to store information about the devices that it serves. *See* Ex. 1001, ¶ 105. From this and the specification, a POSITA would understand that information about both the device and a user is stored in a profile on the server. *See id.*

**Q. "the remote server stores in memory software for a wireless device" (168 (2)) / "the server is configured to store software for a plurality of wireless devices" (168 (4))**

| Smart Mobile's Construction | Defendants' Construction |
|---|---|
| plain meaning, subject to "server," which should be construed as proposed by Smart Mobile | Plain and ordinary meaning, which is: the remote server stores, in memory at the remote server, software on behalf of a wireless device / the server is configured to store software on behalf of a plurality of wireless devices |

Although Defendants purport to advocate for "plain and ordinary meaning" here, they proffer a construction that construes "for" as "on behalf of," "such that the software is linked to a particular wireless device." Dkt. 47 at 31. The Court should reject this. Claim 2 recites that the server is "configured to store wireless device software for a plurality of different functions or applications for use by a plurality of wireless devices." Ex. 15 at 9:61-63. This indicates that the software is not necessarily "linked" to any particular device but rather can be used by multiple devices. Defendants assert that the next limitation, "wherein the remote server stores in memory software for a wireless device," "must require more than merely storing wireless device software in general that is untethered to any particular device." Dkt. 47 at 32. But the claim does not require that the software stored for "a wireless device" be different from the software that is stored for "a plurality of wireless devices." Read in context, it is apparent this limitation merely marks a transition in claim 2 from the "plurality of wireless devices" to "a wireless device," with

the features of the latter being recited in following limitations. Nothing in claim 2 requires that the software stored on the server be "linked to a particular wireless device." As for claim 4, it already recites that "the software is associated with … the device stored in a profile." Ex. 15 at 10:41-42. A POSITA would have no reason to construe a different limitation as requiring a "link" between the software and a device when the claim already requires an "association." Ex. 1001, ¶ 110.

Turning to the specification, Defendants highlight one embodiment in which the wireless device sends a "request for reconfiguration" to a server, which responds by transmitting "functional instruction set 218" to the device, which the device uses to "convert" itself from one mode to another. Dkt. 47 at 32-33. But the specification discloses that the wireless device's mode switching may be "per specific functional instruction sets 218 and preferences stored on the Server C 214 *or in the CT/MD 202 itself*." Ex. 15 at 4:15-17, 7:58-61 (emphasis added). Thus, two preferred embodiments are disclosed: one in which the device sends a "request" to the server for instructions when the device wishes to change modes, and another in which the device switches modes based on instructions and preferences stored in the device itself, without having sent a "request" to the server. Nothing in the claim mandates a construction that excludes the second preferred embodiment.[9]

---

[9] Defendants also suggest prosecution disclaimer. *See* Dkt. 47 at 32-33. Their expert does not address it, *see* Ex. 1, and for good reason. What Defendants cite is not a clear and unmistakable disavowal of claim scope that mandates construing the claim to exclude the second embodiment.

**R.** **"wherein responsive to a request from the one or more wireless device to a website or URL associated with a website server or a network environment, the one or more wireless device receives an indicator of a software application to be downloaded from the remote server" (168 (19))**

| Smart Mobile's Construction | Defendants' Construction |
|---|---|
| plain meaning (subject to "server" and "application," which should be construed as proposed by Smart Mobile), which is that each wireless device that makes a request to a website or URL associated with a website server or a network environment receives an indicator of a software application to be downloaded from the remote server. | Indefinite |

Defendants argue that this term is indefinite because "there is no reasonable certainty which 'one or more wireless device' it applies to." Dkt. 47 at 33. But claim 19 is clear that each of the wireless devices that makes a "request" to a website or URL associated with a website server or a network environment "receives an indicator" of a software application to be downloaded from the remote server. Ex. 1001, ¶ 114. No further identification is required. *See Intellectual Ventures II LLC v. BITCO General Ins. Corp.*, 6:15-cv-59, 2016 WL 125594, at *14-16 (E.D. Tex. Jan. 11, 2016) ("Defendants assert that of the many 'potential users' that the independent claim contemplates, the claim does not specify which one is 'the particular user.' However, the claim is not required to make such an identification. As presented in the claim, the 'particular' user is merely one of the 'one or more potential users.'").

Defendants next argue lack of antecedent basis: "[i]n the context of this claim language 'the one or more wireless devices' is indefinite. It cannot refer to the previously-recited plurality of (i.e., two or more) wireless devices, because 'one or more' is distinct from 'two or more.' Nor can it refer to the previously-recited 'a wireless device,' because that limitation is focused on a singular, specific wireless device." Dkt. 47 at 34. But this argument founders upon basic grammar. Claim 19 includes two scenarios: first, "the one" wireless device makes a "request" and "receives an indicator," and second, each of "the ... more" wireless devices makes a

"request" and "receives an indicator." Antecedent basis for "the one" wireless device can be found in claim 2's recitation of "a wireless device." Antecedent basis for "the … more" wireless devices can be found in claim 2's recitation of "a plurality of wireless devices."

### S.  "more precise location" (168 (21))

| Smart Mobile's Construction | Defendants' Construction |
|---|---|
| Plain meaning. | Indefinite |

Claim 21 depends from claim 2, which recites a system comprising a wireless device and a remote server. Ex. 15 at 9:60-10:25. The wireless device is configured to change operating parameters (transmit and receive frequencies, as well as power levels and output) for operation in different environments. *Id.* at 11:1-25. The specification states that relevant environmental conditions may include the signal to noise ratio and the bit error rate. *Id.* at 2:38-40. A POSITA would understand that these may vary according to the proximity of the wireless device relative to, for example, a cellular base station or a local wireless network access point. Ex. 1001, ¶ 117. The specification explains how the device can switch from one "mode" to another, which the specification describes as switching from one communication "loop" or network to another. Ex. 15 at 4:3-17. Figure 4 and associated text disclose how each network is associated with a set of frequencies. *Id.* at 5:51-6:45; Fig. 4. The specification explains that "the CT/MD 202 may sense … the location of the network box or the net to bring the CT/MD 202 into any local or carrier loop 208." *Id.* at 4:6-9. The specification further discloses that "[t]he system of the present invention, including a wireless device forming a part of the system can work with, for example, GPS … to improve locating capabilities." *Id.* at 2:50-53. Thus, "[t]he ability to sense and switch from one mode to the other may include linking 222 to a Global Positioning System (GPS) 220 that determines the exact location of the CT/MD 202." Ex. 15 at 4:3-6.

To claim 2, claim 21 adds that "the device determines a more precise location using both GPS location and a network box location." Ex. 15 at 12:19-21. In view of the specification, a POSITA would understand that the referenced "location" is that of the device, and that "more precise" location data can improve the device's ability to adapt for operation in different environments, including to switch between networks depending upon environmental conditions such as signal to noise ratio and the bit error rate. Ex. 1001, ¶ 118. A POSITA would also understand that the device of the system recited in claim 21 has improved locating capabilities because it determines its location *both* using GPS data and by sensing a network box location relative to the device, as compared to using only the location of the network box.[10] *See id.*

Defendants argue that "more precise location" is indefinite. According to them, "because claim 2 does not recite any 'location' to begin with, it is unclear what "more precise location" claim 21 requires (i.e., more precise compared to what other location?)." Dkt. 47 at 35. But as explained above, a POSITA would understand that the recited "location" is that of the device, and a location determined using both GPS and a network box location is more precise than a location determined using only the latter. Defendants also argue that "the specification discloses that the device can already determine its 'exact location' using GPS alone," so it is "unclear what it could possibly mean for the device to determine a 'more precise location' using both GPS and a network box location." Dkt. 47 at 25. But Defendants ignore that the specification discloses that the device senses the location of a network box, Ex. 15 at 4:6-9, 7:50-53, and that using GPS in addition "*improv[es]* locating capabilities," *id.* at 2:50-53 (emphasis added). Lastly, Defendants suggest that this claim includes a "'term of degree without any accompanying

---

[10] This is consistent with, for example, claim 12, which recites that the mobile device "is configured for location sensing through use of both GPS and the location of network box and reconfigures one or more parameters based on the location." Ex. 15 at 11:47-50.

guidance in the intrinsic record for determining its scope.'" Dkt. 47 at 35 (citation omitted). "Claim language employing terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014). Here, even if "more precise location" includes a term of degree, the specification provides reasonable certainty that "more precise location" means that a device location determined using both GPS and a network box location is more precise than a device location determined using only the network box location.

## III.    CONCLUSION

For the reasons discussed, the Court should construe the disputed claims as proposed by Smart Mobile and should reject Defendants' claim construction and indefiniteness arguments.

Dated: August 17, 2022                Respectfully Submitted,

                                      _/s/ Philip J. Graves_
                                      Philip J. Graves *(Pro Hac Vice)*
                                      CA State Bar No. 153441
                                      Greer N. Shaw *(Pro Hac Vice)*
                                      CA State Bar No. 197960
                                      **GRAVES & SHAW LLP**
                                      355 S. Grand Ave., Suite 2450
                                      Los Angeles, CA 90071
                                      Telephone: (213) 204-5101
                                      Email: pgraves@gravesshaw.com
                                      Email: gshaw@gravesshaw.com

                                      **STECKLER WAYNE CHERRY & LOVE, PLLC**
                                      8416 Old McGregor Road
                                      Waco, Texas 76712
                                      Telephone: (254) 651-3690
                                      Facsimile: (254) 651-3689
                                      **CRAIG D. CHERRY**
                                      State Bar No. 24012419
                                      Email: craig@swclaw.com
                                      **MARK D. SIEGMUND**
                                      State Bar No. 24117055
                                      Email: mark@swclaw.com
                                      **COUNSEL FOR PLAINTIFF**
                                      **SMART MOBILE TECHNOLOGIES LLC**

## CERTIFICATE OF SERVICE

I hereby certify that counsel of record who are deemed to have consented to electronic service are being served this 17th day of August, 2022, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a). Any other counsel of record will be served by electronic mail, facsimile transmission and/or first-class mail on this same date.


*/s/ Philip J. Graves*
Philip J. Graves