**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| SMART MOBILE TECHNOLOGIES LLC, | |
| Plaintiff, | |
| | Case No. 6:21-cv-00603-ADA |
| v. | |
| APPLE INC. | |
| Defendant. | |
| SMART MOBILE TECHNOLOGIES LLC, | |
| Plaintiff, | |
| | Case No. 6:21-cv-00701-ADA |
| v. | |
| SAMSUNG ELECTRONICS CO., LTD., and SAMSUNG ELECTRONICS AMERICA, INC., | |
| Defendants. | |

**DEFENDANTS' REPLY CLAIM CONSTRUCTION BRIEF
<u>REGARDING THE '501 PATENT FAMILY</u>**

## <u>TABLE OF CONTENTS</u>

I.    Reply to Smart Mobile's Claim Construction Arguments ..................................................... 1

    A.    "server" ('653, '946, '075, '168, '501, '936, '937, '739, '863, '119, '083, '943) ..................................................................................................................... 1

    B.    "functional instruction" ('501, '936, '937, '739, '119) ........................................ 2

    C.    "functional instructions [including instructions] for use in providing a plurality of functions to the [wireless/mobile] device . . ." ('501, '936, '937, '739, '119) ........................................................................................................... 2

    D.    "switching between one or more networks . . ." ('501, '936, '937, '739, '119) ........................................................................................................................ 3

    E.    "the server serves as a primary repository or exchange to deliver various functions to the wireless device" ('501, '739) ........................................................ 5

    F.    "the server serves . . . to deliver various functions to the wireless device," etc. ('501, '739, '936, '937) ............................................................................... 7

    G.    "dynamic / dynamically" ('434, '501, '936, '937, '739, '863, '168) ................... 8

    H.    ". . . the server enables dynamic conversion . . . ," etc. (501, 739, 936, '937, '119) ........................................................................................................................ 8

    I.    "first/second function"/"plurality of functions at (to) the wireless device" ('501, '936, '937, '739, '119) ............................................................................. 10

    J.    "application" ('501, '739, '168) ......................................................................... 10

    K.    "wherein a private network includes a wireless local area network (WLAN) for use in a home or office" ('501, '739) ...................................................... 11

    L.    "the prioritization includes data based on GPS or wireless local area network (WLAN)" ('937) ................................................................................. 11

    M.    "A mobile device communication system . . ." ('119) .......................................... 12

    N.    "the wireless device transmitter and receiver are independently tunable to one or more frequencies" ('168) ..................................................................... 13

    O.    "one or more primary values and subsidiary values" ('168) ................................ 14

    P.    "the software is associated with a user and the device stored in a profile" ('168) ...................................................................................................................... 15

    Q.    "the remote server stores in memory software for a wireless device" / "the server is configured to store software for a plurality of wireless devices" ('168) ...................................................................................................................... 16

    R.    "responsive to a request from the one or more wireless device . . . the one or more wireless device receives an indicator of a software application . . . " ('168) ......................................................................................................... 16

    S.    "more precise location" ('168) ........................................................................... 17

II.    CONCLUSION ..................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                      **Page(s)**

*Augme Techs., Inc. v. Yahoo! Inc.*,
  755 F.3d 1326 (Fed. Cir. 2014).................................................................................10

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
  512 F.3d 1338 (Fed. Cir. 2008)...................................................................................1

*CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Cod. KG*,
  224 F.3d 1308 (Fed. Cir. 2000)................................................................................2, 3

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
  289 F.3d 801 (Fed. Cir. 2002).................................................................................12

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
  358 F.3d 1371 (Fed. Cir. 2004)...................................................................................3

*Clare v. Chrysler Group LLC*,
  819 F.3d 1323 (Fed. Cir. 2016)...................................................................................5

*Hoffer v. Microsoft Corp.*,
  405 F.3d 1326 (Fed. Cir. 2005).................................................................................13

*IQASR LLC v. Wendt Corp.*,
  825 F. App'x 900 (Fed. Cir. 2020) .............................................................................2

*Iridescent Networks, Inc. v. AT&T Mobility, LLC*,
  933 F.3d 1345 (Fed. Cir. 2019)..............................................................................9, 14

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*,
  520 F.3d 1367 (Fed. Cir. 2008)...................................................................................7

*Mizuho Orthopedic Sys., Inc. v. Allen Med. Sys., Inc.*,
  No. CV 21-10979-NMG, 2022 WL 2544665 (D. Mass. July 6, 2022) ....................4

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014)......................................................................................................7

*Nystrom v. TREX Co.*,
  424 F.3d 1136 (Fed. Cir. 2005)...................................................................................2

*Oticon Med. AB v. Cochlear Bone Anchored Sols. AB*,
  No. IPR2017-01018, Paper 52 (P.T.A.B. Aug. 21, 2018) ........................................8

*Pavo Sols. LLC v. Kingston Tech. Co., Inc.*,
  35 F.4th 1367 (Fed. Cir. 2022) ............................................................................4, 11

*Phillips v. AWH Corporation, et al.*,
  415 F.3d 1303 (Fed. Cir. 2005)..................................................................................10

*In re Power Integrations, Inc.*,
  884 F. 3d 1370 (Fed. Cir. 2018)................................................................................16

*TrackThings LLC v. Amazon.com, Inc.*,
  No. 6:21-CV-720-ADA, 2022 WL 2135009 (W.D. Tex. June 14, 2022) ...............................4

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
  587 F.3d 1339 (Fed. Cir. 2009)................................................................................4

## I.    REPLY TO SMART MOBILE'S CLAIM CONSTRUCTION ARGUMENTS

### A.    "server"[1] ('653, '946, '075, '168, '501, '936, '937, '739, '863, '119, '083, '943)

SMT's overbroad interpretation of "server" lacks any basis in the intrinsic or extrinsic evidence.  First, SMT offers no credible evidence for why "server" should be construed to encompass a "program."  D67 at 1-2.  SMT's sole support for including "program" is the *fifth* alternative definition in an IEEE dictionary that does not even use that word, and SMT ignores that the same dictionary includes a definition specifically directed to "a network" that describes a "server" as "a device or computer system."  D68-10, Ex. 1012 at pg. 1031.

Second, SMT fails to justify its proposition that a "server" can be a "collection of computing devices or programs," when every dictionary refers to a "server" in a network as a single device,[2] and the patents consistently do the same.  *See* D47 at 4-5 (citing specification and Exs. 35-38) and D68-10 (Ex. 1012); *see also* '501 patent, 7:56-58 (distinguishing "Office Servers 234" from "Server C 214").  Neither SMT's specification passage that discusses "a central server C 214 (one or more)" nor SMT's invocation of the presumption that "a" generally means one or more, *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1343 (Fed. Cir. 2008), go to the question at issue here—whether the term "server" *itself* should be construed to comprise a collection of multiple computing devices or programs.  It should not.  Indeed, SMT recently argued the opposite in IPR proceedings concerning the '168 patent.  There, SMT argued that a prior art

---

[1]    For brevity, the disputed terms are in shorthand.  Except where otherwise indicated, each complete term, which patents/claims include them, and the proposed constructions can be found in the parties' initial briefs for the '501 patent family.  *See* D47; D67, as filed in the Apple case.  Emphasis added except where otherwise noted.

[2]    The dictionaries do not support SMT's position on "collection."  D67 at 2.  The IEEE dictionary (Ex. 1012) says "computer system," which does not equate to a "collection" of computing devices.  That same dictionary alternatively defines a server as a component on "one device."  And Defendants' Telecom Dictionary (Ex. 38) calls a server "a shared computer," explaining that "[a]t one stage, a local area network had *one* server," but "[t]hese days networks have *multiple* servers."

reference's "Lookup Service" could not be part of its "Server" because those components "are expressly *two separate major parts* of the system." *See* Ex. 57 (IPR2022-00807 POPR), at 7-8.

Third, SMT's proposal that a server provides "resources, data, or programs" or "enables access to a network or network resources" is also unsupported. The specification and claims do not describe servers in this manner, and even if they did, building these properties into the construction of "server" itself would not be appropriate. The claims expressly recite the server's functions (e.g., '501 patent claim 1's server "enables dynamic conversion of the wireless device").

**B.    "functional instruction" ('501, '936, '937, '739, '119)**

Because SMT does not dispute that "functional instruction" lacks customary meaning, the question is "whether the intrinsic evidence provides objective boundaries to the scope of the [coined] term." *IQASR LLC v. Wendt Corp.*, 825 F. App'x 900, 904 (Fed. Cir. 2020) (citing published authority). It does not. SMT attempts to solve this problem by equating the term with "software," but its unexplained string cite to ambiguous passages, none of which state that "functional instructions" is interchangeable with software, does not overcome the presumption that "software" and "functional instructions" mean different things. *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Cod. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000).[3] Indeed, the specification expressly distinguishes the two terms using different abbreviations: "FIS" and "S/W." '501 patent, 3:58. Moreover, SMT's proposal that sets an arbitrary boundary for "functional instruction" by describing it as a certain *type* of "software" has no basis in the intrinsic evidence.

**C.    "functional instructions [including instructions] for use in providing a plurality of functions to the [wireless/mobile] device . . ." ('501, '936, '937, '739, '119)**

All the evidence identified by SMT (D67 at 5-6) is either irrelevant or validates

---

[3]    Claim differentiation also applies across related patents. *See* Section E. Thus, SMT's attempt to distinguish *Nystrom v. TREX Co.*, 424 F.3d 1136 (Fed. Cir. 2005) fails.

Defendants' construction.  SMT focuses on the network switching functional instructions portion of the claim language, but that has little, if any, bearing on the disputed claim term, which refers to functional instructions that are used to provide a plurality of "functions."  SMT's suggestion that the network switching functional instructions is a subset of the functional instructions that provide a plurality of "functions" is unsupported by the claim language.  Moreover, SMT's argument mischaracterizes portions of the '501 specification relating to switching between networks.  *See id.* (citing '501 patent, 4:13-15, 7:50-53); *see infra* Section I.E.

SMT also points to claim 5 of the '501 patent (D67 at 5-6), but that claim states the claimed wireless device can be "adapted to control home intelligent appliances including any of a TV, oven, microwave, and other appliances."  '501 patent, 10:4-6.  In other words, the wireless device can "be" one of many different types of devices, including a TV remote, that control home appliances.  *Id.*, 4:54-55.  This, and the other similar passages cited by SMT, supports Defendants' construction.  *Id.* (citing '501 patent, 8:66-9:2).

Finally, SMT misunderstands Defendants' positions.  D67 at 6.  Defendants' position remains that the phrase "functional instructions" is indefinite (*see* Section I.B), that the claimed "functions" are types of mobile/wireless devices (*see* Section I.H), and that the rest of this claim term should otherwise be given its plain and ordinary meaning.

**D.    "switching between one or more networks . . ." ('501, '936, '937, '739, '119)**

SMT concedes that "switching between one or more networks" is "grammatically imperfect claim drafting."  D67 at 7.  SMT argues this phrase is an error that the Court should rewrite as "switching between multiple networks."  *Id.*  The Court, however, cannot rewrite patent claims.  *See Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1373 (Fed. Cir. 2004).  It may only correct "obvious minor typographical and clerical errors," and "only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification

and (2) the prosecution history does not suggest a different interpretation." *Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, 35 F.4th 1367, 1373 (Fed. Cir. 2022) (citation omitted). Such "[j]udicial correction is 'a narrow remedy to be used sparingly.'" *Mizuho Orthopedic Sys., Inc. v. Allen Med. Sys., Inc.*, No. CV 21-10979-NMG, 2022 WL 2544665, at *8 (D. Mass. July 6, 2022).

SMT's proposed redrafting is neither obvious, minor, nor free from reasonable debate. For example, the specification contradicts SMT's argument that the patents are obviously directed to "switching between multiple networks." It states a mobile device that is already in the "local office loop" can "can switch itself for optimal performance in the local office loop"—an unexplained type of switching associated with a single network, i.e., the local office loop. *See* '501 patent, 5:39-42; *see also id.* at 5:1-4. While the specification mentions this as part of its aspirational discussion of a do-it-all mobile device, nowhere does it provide a POSITA with reasonable certainty of what the claim phrase directed to switching between "one" network actually means (a point that SMT apparently does not dispute). Nor is SMT's proposal that the term means switching between "multiple" (two or more) networks free from reasonable debate. The specification, including passages SMT cites, discusses switching between *three* networks: "local office," "public carrier loop," and "home loop." *See* '501 patent, 5:11-12; 7:49-50; Figs. 2A-2C.

Likewise, "the prosecution history does not suggest that this [challenged phrase] was a typographical error." *TrackThings LLC v. Amazon.com*, Inc., No. 6:21-CV-720-ADA, 2022 WL 2135009, at *10 (W.D. Tex. June 14, 2022). It was present in an original claim set (Ex. 58, '501 Patent File History, September 13, 2012 Transmittal of New Application), and retained over years of subsequent amendments and prosecution of multiple, related patents.

Finally, in the *Ultimax* case SMT cites, the court expressly found that its correction of a typographical error did not change the claim's plain meaning. *See Ultimax Cement Mfg. Corp. v.*

*CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1348 (Fed. Cir. 2009) ("[I]nterpreting the claim in that way merely restates its plain meaning."). In contrast, SMT's proposed redrafting does not simply restate the claim's plain meaning; it fundamentally changes the claim's plain meaning.

### E.    "the server serves as a primary repository or exchange to deliver various functions to the wireless device" ('501, '739)

Only Defendants' construction gives effect to the claim language. SMT, on the other hand, proposes to construe this term the same as two differently-worded terms from related patents.[4] D47 at 12-13. SMT's sole justification for this untenable position is that "[t]he doctrine of claim differentiation is not as strong across related patents." D67 at 11 (quoting *Clare v. Chrysler Group LLC*, 819 F.3d 1323, 1330 (Fed. Cir. 2016)). There are two problems with SMT's position. First, in *Clare*, the Federal Circuit *did* apply claim differentiation to related patents, and only deviated from it when the doctrine would have excluded *all* disclosed embodiments. *Clare*, 819 F.3d at 1330. SMT cites no authority for ignoring claim differentiation across related patents when the claim language plainly corresponds to an embodiment.[5] Second, the circumstances of this case make claim differentiation across related patents appropriate because the applicants filed and subsequently amended all three related patent applications *on the same day*. D47 at 12-13. The applicants considered the language of all three applications simultaneously, and consciously chose the wording for each one.

SMT's criticisms of Defendants' inclusion of "all" in their proposed construction are similarly flawed. SMT disparages the IEEE Standard for Software Maintenance because "the

---

[4]    SMT proposes the same constructions for this and two other terms. D47 at 12-13.

[5]    SMT concedes the "mode reconfiguration requests" part of Defendants' construction describes how one embodiment operates, but complains the claim language is "plainly broader." D67 at 10. However, the parties dispute this term's construction, so it does not have a "plainly" apparent scope. Moreover, "primary repository" term must be *narrower* than the other two terms for which SMT proposes identical constructions, as it has elements the other two lack.

patents are not directed to 'software maintenance'" (D67 at 9) despite the patents stating that functional instruction sets are "*maintained* on a Central Server C" ('501 patent, 6:59-61).  SMT argues that other dictionaries indicate that a "repository" stores just "some" software (D67 at 9), but none of the referenced exhibits refer to just "some" software.  Similarly, SMT argues that the word "primary" in the claim indicates that some software may be stored elsewhere (*id.* at 10), but SMT fails to appreciate that a server (e.g., the primary repository or exchange) storing "all" software does not exclude the wireless device from also storing some software.  *Id.* at 9.

SMT argues that Defendants exclude a preferred embodiment, but SMT misinterprets the specification.  D67 at 10.  SMT identifies an alleged example (4:13-15) where the device stores the software for "mode reconfiguration," but the specification actually states that the "specific functional instructions sets 218 and preferences" stored at the device are for the capability to *decide when* to switch modes, e.g., based on stored preferences, not the capability to actually achieve mode reconfiguration.  '501 at 4:8-15.  This is consistent with the invention's intent to rely on the server to deliver FIS and software for the different modes, even if the device itself makes the decision to switch.  *Id.*, 4:13-15 ("This switching may be automatic or per specific functional instruction sets 218 and preferences stored on the Server C 214 or in the CT/MD 202 itself."), 7:50-53 (similar).

SMT incorrectly argues that the claims do not recite "uploading" and so this word in Defendants' proposal is inappropriate.  D67 at 10.  The claims do, however, recite an "exchange," which requires a give-and-take concept captured in Defendants' proposal.

Finally, SMT's argument about prosecution history (D67 at 11-12) addresses a disclaimer argument that Defendants never made.  Defendants refer to the prosecution history because it shows that the patentees viewed the differently-worded claims as having different meanings.

F.    **"the server serves . . . to deliver various functions to the wireless device," etc.**
      **('501, '739, '936, '937)**

Defendants' construction captures that the claimed server can "deliver," "send," or "provide" information to a mobile device.  SMT would omit these actions from the claim by grouping them under "configured to transmit."  This is most evident for the claim term that begins "the server provides," where SMT would replace a verb (i.e., "provides"), with a capability (i.e., "configured to transmit").  SMT's other arguments about claimed "functions" being transmitted to a mobile device being "software or application data . . . that enables a plurality of capabilities" (D67 at 12-13) are belied by the absence of "application data" in the specification.  Moreover, SMT misinterprets the portion of the '501 specification that serves as the basis for this argument ('501, 4:13-17), as discussed in Section I.E.[6]  SMT also concedes that its reading of the intrinsic evidence and its proposed construction lead to inconsistencies in the claim language.  D67 at 13.

In its response, SMT acknowledges its "function" proposals are inconsistent (D67 at 13), but suggests this is an acceptable result by citing inapposite case law stating that a claim term that appears multiple times does not necessarily need to be construed the same way.  *Id.* (citing *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367 (Fed. Cir. 2008)).  *Microprocessor* relates to indefiniteness under the no-longer-applicable "insolubly ambiguous" standard, and does not apply here.  *Microprocessor*, 520 F.3d at 1375-77; *see Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014) (overruling "insolubly ambiguous" standard).  Moreover, the Federal Circuit agreed in *Microprocessor* that the same words are presumed to have same meaning.  *Microprocessor*, 520 F.3d at 1375.  Finally, and critically, in contrast with *Microprocessor*, where a uniform definition purportedly created "nonsensical" conflicts (*id.*),

---

[6]    SMT also misinterprets Defendants' construction as requiring a physical connection.  D67 at 13.  As discussed in Section I.G, this is not Defendants' position.

construing "function" in accordance with Defendants' construction results in no such thing.  *See* Sections I.C and I.H.

### G.    "dynamic / dynamically" ('434, '501, '936, '937, '739, '863, '168)

SMT's brief confirms that "dynamic" is indefinite.  By citing to passages that describe the mobile device being "dynamically" tuned to different environments (D67 at 14-15, citing '501 patent, 2:40-46, 6:47-51), SMT underscores the problem: the patent does not explain how "dynamic" tuning differs from just tuning.  Indeed, SMT's construction even contradicts its own infringement theories.  Here, SMT argues for the term to mean "without the need for user intervention," but in its contentions SMT accuses user-directed switching from one application to another.  Ex. 59, Samsung Inf. Cont. Ex. D ('739 patent) at 9.  In any event, the PTAB recently rejected SMT's construction, tentatively construing the term as "conversion when and as needed and in real time."  Ex. 60, IPR2022-00808 Decision Granting Institution of IPR at 12.[7]

### H.    ". . . the server enables dynamic conversion . . . ," etc. (501, 739, 936, '937, '119)

The specification passages SMT relies on (D67 at 17) support Defendants' position that the invention is directed to changing between two different types of devices, because the specification discusses "a wireless device instantly *becom[ing] a cell pho*ne."  *Id.* at 17 (citing '501 patent, 6:13-18).  This aligns with Defendants' construction of transforming between types of devices, and underscores why SMT is incorrect to argue that Defendants' construction would provide for a "nonsensical" result where a server provides a plurality of types of devices *to* or *for* control of a mobile device.  D67 at 16 n.5.  Instead, Defendants' construction captures what the inventors thought they invented (*see* D47 at 17-20), i.e., a server controls transforming a mobile

---

[7]    Defendants did not offer to construe this term in their IPR petition because the PTAB does not entertain indefiniteness arguments in IPR proceedings.  *See Oticon Med. AB v. Cochlear Bone Anchored Sols. AB*, No. IPR2017-01018, Paper 52 at 14 n.9 (P.T.A.B. Aug. 21, 2018).

device from one type of device to another.

Second, SMT misstates the law when it suggests that prosecution history is only relevant if it is a disavowal (D67 at 17-18).[8]  *See, e.g.*, *Iridescent Networks, Inc. v. AT&T Mobility, LLC*, 933 F.3d 1345, 1352-53 (Fed. Cir. 2019) ("[A]ny explanation, elaboration, or qualification presented by the inventor during patent examination is relevant[.]").

Third, SMT's complaints about Defendants omitting necessary context (D67 at 17-18) are also unavailing because the omitted passage identified by SMT supports Defendants' construction: "Applicant addresses and solves the problem for ubiquitous communication using a single CT /MD that can transform or morph by software means from one type of communication device to another and *communicate in a multiplicity of communication protocols for different types of communication needs*."  D48-20, Ex. 20 at SM0001169 (emphasis showing SMT-identified portion).  As stated, the alleged invention is a device that can transform between different types of devices that have different communication needs, and therefore use different communication protocols, such as transforming from a cellular phone using cellular protocols to a TV remote that might use an infrared protocol.  This is directly captured by Defendants' construction.

Fourth, SMT criticizes Defendants' reliance on the prosecution history to show that one type of device would have a different set of capabilities versus another type, but SMT fails to provide any *actual* analysis.  *Compare* D67 at 18, *with* D68-1, Ex. 1001 at ¶ 73.  The Court should give little, if any, weight to such a rebuttal.  Substantively, the debated portion of the prosecution history supports Defendants' construction.  D48-20, Ex. 20 at SM0001145.  It shows that the applicants noted the prior art device "*remains the same* with the same original capabilities,"

---

[8]    SMT incorrectly states that Defendants' construction requires "physically" transforming or morphing into a different device.  D67 at 17-18.  A physical transformation is not required under the claims.  D47 at 18.

emphasizing that the alleged invention is different because a "pager could be configured as a cellular phone" (i.e., transforming from one type of device to another) and a device can be "transform[ed] from one communication protocol to another" (i.e., transforming from one capability to another, such as from a pager protocol to a cellular protocol).

I.     **"first/second function"/"plurality of functions at (to) the wireless device" ('501, '936, '937, '739, '119)**

The parties agree that any disputes for this claim term are encompassed by other, larger claim terms that the parties have briefed. D47 at 20; D67 at 19; *see supra* Section I.H.

J.     **"application" ('501, '739, '168)**

Defendants accept SMT's construction as it applies to the '168 patent's claims 5, 19, 22 and the '434, '653, '863, '291, and '946 patent's claims. The remaining dispute is whether "application" means "use, role or task" in some '501 family claims.[9] In short, "application" must mean a "use, role or task" in some claims because otherwise it does not fit into the claim language. For example, claim 17 of the '501 and '739 patents recites "applications" and "functions" interchangeably in a list of tasks the device may perform (e.g., "video applications" and "television functions"). SMT does not dispute that "application" can have different meanings depending on context, or that "application" can mean "use, role or task" in certain contexts. D67 at 20. SMT's sole opposition to Defendants' proposal is the conclusory assertion—echoed by its expert—that a POSITA would take SMT's side. *Id.*[10] These conclusory assertions cannot overcome the context of the claims and the specification. *Phillips*, 415 F.3d at 1313 (stating that a POSITA must read a claim term in context); *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1336 (Fed. Cir. 2014) (declining to give evidentiary weight to conclusory expert statements).

---

[9]   The relevant claims are '168 claims 2 and 4, '501 claim 17, and '739 claim 17.
[10]  SMT's expert parrots this conclusory argument almost verbatim. D68-1, Ex. 1001 at ¶ 77.

### K.    "wherein a private network includes a wireless local area network (WLAN) for use in a home or office" ('501, '739)

SMT all but admits this dependent claim term lacks antecedent basis.  *See* D67 at 21.  SMT asks the Court to correct this error by reinterpreting the claims to require switching between at least the "public network," recited by claim 1, and the "private network," recited by claim 18.  It argues (1) that the claims contemplate an implied network "additional to the public network" and (2) that "the specification discloses embodiments that switch between networks."  D67 at 21; D68-1, Ex. 1001 ¶ 82.  SMT's attempt to save the claim fails for at least two reasons.

First, the Court should preclude SMT's new proffered construction as untimely.  *See* D57 (Amended Scheduling Order).  SMT has consistently asserted only that the "plain meaning" of this term should apply.  But this term's plain meaning, if anything, is that a private network— somewhere in the world—must exist that includes a WLAN network.  It indisputably says nothing about *switching* to any private network.  *See* D67 at 21 (alleging what a POSITA would ascertain).

Second, SMT's proposed correction is not "obvious" or free from "reasonable debate." *Pavo Sols. LLC* at 1373; *see also* Section D (discussing standard for correcting typos).  Indeed, it is unclear what correction SMT even proposes.  SMT proposes that "a POSITA would reasonably ascertain that the 'private network' recited in claim 18 is one of the 'networks' that the device is capable of 'switching between' as recited in claim 1."  But as drafted, claim 1 does not require switching between at least a "public network" and a "private network."  SMT does not clarify whether SMT is proposing to redraft claim 1 and claim 18, or just claim 18.  Whether SMT proposes the former or just the latter, neither redrafting is justified here.

### L.    "the prioritization includes data based on GPS or wireless local area network (WLAN)" ('937)

SMT admits that claim 18 provides no express antecedent basis for "the prioritization" but argues that the antecedent basis is "present by implication" and would be understood by a POSITA

as meaning that "the wireless device's 'prioritization' of connecting to one network over another will be based upon GPS location information or information regarding proximity of a wireless local area network relative to the device." D67 at 22-23. Not only is the actual claim language nonsensical, but the specification does not support SMT's post hoc reasoning. First, the claim language states the prioritization includes data "based on" a WLAN, not based on *proximity* to a WLAN (as SMT proposes). Second, the specification passage SMT cites states only that the device may switch from one mode to another by "linking to" GPS or "sens[ing]" the location of a network box. '937 patent, 4:1-7. Nowhere does the specification explain how to implement any *prioritization* "based on GPS" much less "based on . . . wireless local area network (WLAN)." SMT speculates that a device may want to switch networks based on signal strength, but the specification does not describe any "prioritization" based on signal strength. *See also* Section O (further addressing "prioritization"). And, SMT does not explain why a device wishing to switch based on signal strength would not just do so based on signal strength, regardless of its location.

## M.    "A mobile device communication system . . ." ('119)

This preamble is limiting if it meets any one of three conditions. *See* D47 at 25 (identifying legal test). SMT does not dispute the first two are met here—i.e., that the "server" is both essential to the claims and underscored in the specification as an important part of the "system." *See* D47 at 25-26; D67 at 23-24. Accordingly, the preamble should be construed as limiting.

SMT's argument on the third condition is wrong. SMT argues that claim 20 recites a "structurally complete invention in the claim body, without a 'server.'" *Id.* at 23-24.[11] Yet, SMT

---

[11]    SMT's authority is of limited value in determining whether the claim recites a "structurally complete invention." Unlike here, *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.,* 289 F.3d 801, 808 (Fed. Cir. 2002) concerned a phrase stating an "intended use," which absent exception generally will not justify limiting the preamble.

ignores that according to the express claim language, the server "enables conversion of the mobile device from a first function to a second function" and "is configured to connect to an Internet network or a carrier network."[12]  Without a server, those essential claim requirements have no structural home.  That the server properties happen to be expressed in a "wherein" clause does not mean it is not an essential part of the claimed "system."  "[W]hen the 'whereby' clause states a condition that is material to patentability, it cannot be ignored in order to change the substance of the invention."  *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1329 (Fed. Cir. 2005); D48-20, 09/591,381 file history at SM00001144 (relying on "conversion" for patentability).

### N.    "the wireless device transmitter and receiver are independently tunable to one or more frequencies" ('168)

This claim language is indefinite because a POSITA would not be reasonably certain what it means.  SMT embraces one potential interpretation, arguing that "the transmit and receive frequencies need not be the same."  D67 at 24.  However, a POSITA would not be reasonably certain that SMT's preferred interpretation applies here.  The specification discusses transmitting and receiving collectively as "T/R" (Transmit/Receive).  SMT identifies nowhere that the specification distinguishes "transmit" frequencies from "receive" frequencies.  SMT offers two citations as alleged support for its position ('168 patent, 4:28-29, 6:1-5), but SMT does not explain how either indicates that the "transmit" and "receive" frequencies differ.[13]  SMT simply states its preferred interpretation as fact, supported by nothing more than a conclusory expert declaration that parrots the same statements.  *Compare* D67 at 24 *with* D68-1 ¶ 93.

SMT downplays the confusion caused by asserting single transmitter/receiver claims

---

[12]  Because these limitations recite express requirements for "server," Defendants disagree that "if the preamble is not limiting then the server is not part of the claimed system."  D67 at 23.

[13]  In the case of one passage SMT relies on (4:28-29), it is unclear whether the disclosure even relates to the *mobile device's* frequencies.  The passage refers to "local office 230."

against products that have multiple of each, arguing that the claims use "transmitter" and "receiver" to "collectively include one or more" of each. D67 at 25. But SMT offers no evidence to support that assertion other than an *ipse dixit* expert opinion. It is undisputed that the specification does not "depict transmitters and receivers for cellular communications separately from transmitters and receivers for local wireless communications." D67 at 25.

### O.    "one or more primary values and subsidiary values" ('168)

The '168 patent does not support SMT's interpretation of this term and, in fact, is so internally inconsistent that a POSITA would not be reasonably certain as to this term's scope. SMT alleges (1) that the specification discloses "modes" in which certain networks may be deemed "primary" and others deemed "secondary" or "tertiary"; and (2) that "primary values" refers to the frequencies associated with the "primary" network and "subsidiary values" refers to frequencies associated with the "secondary" network.[14] D67 at 26.

The patent, however, is entirely unclear. It alternates between using "modes" to describe (1) the states of a *device*, or (2) *networks* a device connects to. For example, Figure 4 describes a "current mode" and a "requested mode," corresponding to the state of a *device*.[15] D67 at 26. Figure 4's corresponding written description, however, describes each *network* within each of these states (e.g., public carrier, home, and local office—labeled primary, secondary, and tertiary in table 402) as a "mode." '168 patent, 5:53-56.

Finally, the specification expressly contradicts SMT's position that the "primary"

---

[14]    Additionally, SMT ignores entirely the claim language stating that the transmit and/or receive frequencies *include* values—not that the frequencies are themselves values.

[15]    SMT claims "the specification uses 'frequency' to refer to one or more frequencies." D67 at 28. But no passage states that a wireless device operates on an entire "frequency [band/domain]." The patent instead states that a wireless device operates "at a single set frequency" within a narrow frequency band (1:13-14)–not that it transmits using the entire band itself–and that a "loop," which consists of components in addition to the wireless device, such as network box, is able to "T/R" in a specific frequency band (6:61-63).

frequency is simply the preferred one.  The specification describes a "primary frequency" only once—where it is used to describe the frequency of a *secondary* network (not a primary network).  For example, the specification describes the process of the device going from current mode (402) in which the public network is primary and the home network is secondary to requested mode (404) in which the local office network is primary and the public network is secondary.  *See id.* at Fig. 4, 5:56-6:45.  Within that passage, the specification states that when T/R blocks are set "to primary frequency Fp," the mobile device is converted to "local office mode 230."  *Id.* at 6:2-5.  But the alleged *primary* frequency Fp corresponds to the *secondary* network (public) in the requested mode—not the primary network (office).  *See* Fig. 4 (table 404).

**P.    "the software is associated with a user and the device stored in a profile" ('168)**

SMT assumes a POSITA would understand "the software" can take its antecedent basis from the limitation that follows.  But "antecedent," by definition, refers to one thing that precedes another, so the two claimed instances of "software" presumably refer to different things.  SMT misstates Defendants' argument regarding the ambiguity of what must be stored in a profile.  The parties *agree* that a user and a device (physical objects) cannot be stored in a profile.  Problematically, however, the claims fail to state what must be stored in a profile (if not those physical objects).  SMT asserts that *information* "about a user and device" must be stored in a profile.  But that is not what the claim states.  Another way to rewrite this garbled language would be that the *software*, which happens to be "associated with a user and the device" is stored in a profile.  D47 at 29-31.  SMT fails to explain why a POSITA would be reasonably certain which meaning should apply, or why it should be rewritten in the first place given that it cannot be understood.  Finally, none of SMT's specification passages shed light on what must be stored *in* a profile—they just state that profiles may be stored on a server and that a device may use a profile (which it treats as an example of user specific information).  D67 at 28-30.

**Q.      "the remote server stores in memory software for a wireless device" / "the server is configured to store software for a plurality of wireless devices" ('168)**

The meaning of "store . . . for" in these terms is store "on behalf of."  SMT focuses on the plural vs. singular "device(s)" language and argues that it is just a "transition" in grammar and nothing more (D67 at 30-31), but that reasoning fails for two reasons.  First, it overlooks that the plural/singular issue is not the only difference between the phrases in claim 2; the phrases also use "store . . . for use by" and "store . . . for."  SMT does not address this difference, or that its construction would render the difference meaningless.  *In re Power Integrations, Inc.*, 884 F. 3d 1370, 1376 (Fed. Cir. 2018) (rejecting a construction that "renders claim language meaningless").  Second, SMT's argument does not square with claim 6, which recites a singular "wireless device" throughout, indicating that the patentees intended meaning beyond a mere grammatical shift.[16] The intrinsic evidence further supports this conclusion, and SMT's only response is to mistakenly argue that "two preferred embodiments are disclosed," and "[n]othing in the claim mandates a construction that excludes the second preferred embodiment."  D67 at 31 (quoting '168 patent, 4:15-17, 7:58-61).  However, as explained above (§ II.E), SMT's interpretation of the relied-upon disclosure is wrong, and so its argument here is incorrect as well.

**R.      "responsive to a request from the one or more wireless device . . . the one or more wireless device receives an indicator of a software application . . . " ('168)**

SMT asserts that '168 patent "claim 19 is clear that each of the wireless devices that makes a 'request' to a website or URL . . . 'receives an indicator' of a software application to be downloaded from the remote server."  D67 at 32.  But independent claim 2 does not recite any such devices.  SMT's attempt to stitch together antecedent basis based on claim 2's remote server

---

[16]  SMT's arguments for this term also do not square with its arguments for construing "server" as a "program."  SMT Brief at 1.  Applying SMT's proposed construction here would lead to the confusing situation where the remote program stores another program in memory.

that stores applications for a "plurality of wireless devices" and "a wireless device" does not solve the ambiguity.  Even assuming those terms could provide antecedent basis, a POSITA would not be reasonably certain which devices from claim 2 must make the "request," because claim 2 does not recite "one or more" wireless devices.  *See* D47 at 33-35.

### S.    "more precise location" ('168)

SMT does not dispute that claim 2 fails to recite any "location" that provides a benchmark relative to claim 21's "*more precise* location."  SMT nevertheless argues that the specification dictates the "recited 'location' is that of the device" and that this location is "more precise" in the sense that a location "determined using both GPS and a network box location is more precise than a device location determined using *only the network box location*."  D67 at 34-35.

SMT's proposed construction is not only untimely, but it is also the opposite of what SMT argues for infringement.  SMT claims that Defendants' devices infringe because they supposedly use a "network box" location to increase accuracy compared to using *GPS technology alone*.  *See* Ex. 61, Samsung Sup. Inf. Cont. Ex. L at 20 n. 73 (quoting marketing language stating that "[s]et your phone to *use the Wi-Fi or Bluetooth feature to increase the accuracy* of your location information"); Ex. 62, [https://www.samsung.com/latin_en/support/mobile-devices/how-to-activate-my-location-and-change-settings-for-location-permissions/](https://www.samsung.com/latin_en/support/mobile-devices/how-to-activate-my-location-and-change-settings-for-location-permissions/) (stating as background that a "Galaxy phone uses a GPS antenna to track real-time location data").  That not even SMT can consistently apply its own claim undermines any argument that a POSITA would be able to.

## II.    CONCLUSION

For at least the foregoing reasons, Defendants respectfully request the Court construe the disputed terms as proposed by Defendants.

Date:  October 12, 2022

DLA PIPER LLP

_/s/ Michael D. Jay_
John M. Guaragna
Texas Bar No 24043308
DLA PIPER LLP (US)
401 Congress Avenue, Suite 2500
Austin, TX 78701-3799
Tel: (512) 457-7125
Fax: (512) 457-7001
john.guaragna@us.dlapiper.com

Mark D. Fowler (*pro hac vice*)
DLA PIPER LLP (US)
2000 University Avenue
East Palo Alto, CA 94303-2250
Tel: (650) 833-2000
Fax: (650) 833-2001
mark.fowler@us.dlapiper.com

Tiffany C. Miller (*pro hac vice*)
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101-4297
Tel: (619) 699-2700
Fax: (619) 699-2701
tiffany.miller@us.dlapiper.com

Michael D. Jay (*pro hac vice*)
Nandan R. Padmanabhan (*pro hac vice*)
Martin M. Ellison (*pro hac vice*)
DLA PIPER LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067
Tel: (310) 595-3000
Fax: (310) 595-3300
michael.jay@us.dlapiper.com
nandan.padmanabhan@us.dlapiper.com
martin.ellison@us.dlapiper.com

Respectfully Submitted

FISH & RICHARDSON P.C.

_/s/ Aamir A. Kazi_
David M. Hoffman
Texas Bar No. 24046084
hoffman@fr.com
111 Congress Avenue, Suite 810
Austin, TX 78701
Tel: (512) 472-5070
Fax: (512) 320-8935

Ruffin B. Cordell
Texas Bar No. 04820550
cordell@fr.com
Michael J. McKeon (*pro hac vice*)
mckeon@fr.com
Sun Young Park (*pro hac vice*)
apark@fr.com
Joshua Rosefelt (*pro hac vice*)
rosefelt@fr.com
1000 Maine Avenue, SW, Suite 1000
Washington, DC 20024
Tel: (202) 783-5070
Fax: (202) 783-2331

Leonard Davis (*pro hac vice*)
Texas Bar No. 05521600
ldavis@fr.com
Thomas H. Reger, II
Texas Bar No. 24032992
reger@fr.com
Andria Rae Crisler
Texas Bar No. 24093792
crisler@fr.com
1717 Main Street, Suite 5000
Dallas, TX 78766
Tel  (214) 747-50710
Fax (214) 747-2091

18

Joel Chao-Iee Lin (*pro hac vice*)
DLA PIPER LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, NY 10020-1104
Tel: (212) 335-4500
Fax: (212) 335-4501
joel.lin@us.dlapiper.com

**Counsel for Defendant**
***APPLE INC.***

Christopher O. Green (*pro hac vice*)
cgreen@fr.com
Aamir A. Kazi (*pro hac vice*)
kazi@fr.com
Brian P. Boyd (*pro hac vice*)
bboyd@fr.com
Jonathan B. Bright (*pro hac vice*)
jbright@fr.com
1180 Peachtree Street, NE, 21st Floor
Atlanta, GA 30309
Tel: (404) 892-5005
Fax: (404) 892-50020

**Counsel for Defendants**
***SAMSUNG ELECTRONICS CO., LTD.***
***AND SAMSUNG ELECTRONICS***
***AMERICA, INC.***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF on October 12, 2022.  Any other counsel of record will be served by e-mail on this same date.

*/s/ Aamir A. Kazi*
Aamir A. Kazi
